ROY E. AND KATHLEEN A. McALISTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McAlister v. Commissioner
Docket Nos. 17820-81, 16290-85.
United States Tax Court
T.C. Memo 1989-177; 1989 Tax Ct. Memo LEXIS 168; 57 T.C.M. (CCH) 166; T.C.M. (RIA) 89177; April 18, 1989. Roy E. McAlister, pro se. David W. Otto, for the respondent. SWIFT
*170 MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes for the years 1973 through 1979 in a notice of deficiency dated April 15, 1981, and for the years 1980 through 1982 in a notice of deficiency dated March 11, 1985, as follows: Additions to Tax, I.R.C. Sec. [1]
Year
Deficiency
6651(a)
6653(a)
6653(a)(1)
6653(a)(2)
6653(b)
1973
$  57,217.83
$ 28,608.92
1974
4,289.60
2,144.80
1975
1,988.05
994.03
1976
28,925.85
14,462.93
1977
50,133.38
$  2,516.67
25,066.69
1978
166,663.09
8,333.15
83,331.55
1979
53,257.94
2,662.89
26,628.97
1980
284,577.00
14,229.00
1981
4,398.00
$ 220.00
*
1982
473.00
$ 95.00
24.00
*
Respondent has conceded the additions to tax pursuant to section 6653(b) for the years 1973 through 1979, and respondent *171 acknowledges that the tax deficiencies determined for the years 1973 through 1976 are barred from assessment due to the expiration of the statute of limitations. At trial, respondent also conceded the tax deficiencies and additions to tax determined for 1981 and 1982. Some of the many issues remaining for decision in these consolidated cases are: (1) Whether petitioners' depreciable bases in certain patents and related technology and business assets exceed amounts determined by respondent; (2) whether petitioners are entitled to deductions for research and development expenses in excess of amounts allowed by respondent; and (3) whether $ 315,000 was erroneously accrued into income by petitioners on their 1980 joint Federal income tax return. References to "petitioner" in the singular are to Roy E. McAlister. FINDINGS OF FACT Petitioners resided in Phoenix, Arizona at the time the petition in this case was filed. Petitioner is a talented and ambitious inventor whose inventive efforts during the years before us constantly were diverted by the need to raise capital and by a number of overlapping, vague, and non-arm's-length business relationships petitioner entered into with *172 various individuals and entities. In 1964, petitioner graduated from the University of Kansas with a B.S. degree. Following graduation, petitioner worked as an engineering consultant. In 1966, petitioner obtained an M.S. degree and moved to Phoenix, Arizona, where he owned and operated a machine shop under the name of Research Engineering and Manufacturing ("REM"). While operating REM, petitioner taught engineering classes and took courses in a Ph.D. engineering program at Arizona State University. Petitioner's research on his Ph.D thesis necessitated the use of equipment not available at the university. Garrett Corporation ("Garrett"), which had an office in Phoenix, became interested in petitioner's thesis research and permitted petitioner to use its machine shop to conduct research. Both Arizona State University and Garrett compensated petitioner for his research. It was petitioner's understanding that shop-rights in research associated with his thesis vested in the university and in Garrett. [2] Garrett refused to allow the results of petitioner's research to be published and instead regarded the results of petitioner's research as proprietary trade secrets that it owned. *173 As a result, petitioner did not present and publish his thesis, and he did not receive a Ph.D in engineering. Because of this unpleasant experience, in 1970 petitioner decided he would independently develop his inventions. In subsequent years, more than 20 patents were issued in petitioner's name. Petitioner's inventions have related to such things as spark plugs, fuel injection systems, solar panels, and food processing equipment. As will become evident, however, petitioner did not adhere to his decision to independently develop his research and inventions. *174 Much of the remaining factual background relevant to the issues in this case relates to petitioner's patents, inventions, and related technology that he developed during the period 1969 through 1981 and to the unusual financial arrangements petitioner entered into, largely without legal advice, to develop and promote his patents, inventions, and technology. We have organized the remaining findings of fact according to each major category of petitioner's inventions or according to each new entity or individual that became involved in petitioner's inventions. The record is inadequate and sketchy with regard to many aspects of the transactions petitioner entered into. Nu Ava Foods, Inc. and Kansas Schoolhouse Property
At about the time petitioner moved to Phoenix in 1966, petitioner acquired property in Harvey County, Kansas, that had been used as a rural schoolhouse. Petitioner made improvements to buildings on the property so that the buildings could be used as laboratory, testing, and manufacturing facilities for his inventions. In August of 1969, petitioner and his sister, Ava Jane Miller, as President of Nu Ava Foods, Inc. ("Nu Ava"), a Kansas corporation, entered *175 into an agreement with respect to certain technology petitioner had developed and contemplated developing in subsequent years. Nu Ava was primarily in the business of manufacturing and selling food products made from grain. Nu Ava utilized recipes developed by petitioner's mother and by Ava Jane Miller. Petitioner's parents and four sisters controlled the stock in Nu Ava. Under the agreement between petitioner and Nu Ava, petitioner purported to convey to Nu Ava all rights, title, and interest in technology relating to petitioner's "Total Energy Inventions," specifically including a fuel injection system, a solar collection system, roof insulation materials, and a high-turbulence heat exchanger. Petitioner claims that the technology he invented relating to the fuel injection system, combined with some of his other inventions, constituted a fuel injection system that could be applied to a vast number of existing internal combustion engines producing substantially more efficient car, boat, train, and industrial engines and allowing productive use of waste heat. Under the August 1969 agreement, Nu Ava was obliged to undertake efforts to further develop the technology. The agreement *176 with Nu Ava reflected that petitioner was to transfer the relevant technology to Nu Ava in full repayment of "loans and other considerations" previously received by petitioner from Nu Ava. The agreement with Nu Ava, however, did not specify the amount of any loans petitioner had received from Nu Ava, nor did it describe the amount or nature of any "other considerations" petitioner received in exchange for transferring the technology to Nu Ava. Further research relating to the Total Energy Inventions was to be conducted at the Kansas schoolhouse property which Nu Ava was to lease from petitioner. Under the above agreement with Nu Ava, petitioner individually was to have the right to continue to use the technology for five years during which period he also had the option to repurchase the technology from Nu Ava. Nu Ava was to receive a royalty of 10 percent on any sales of the technology relating to the Total Energy Inventions during the five-year option period. Paragraph 3 of the 1969 agreement with Nu Ava described petitioner's repurchase option and is important to the dispute between petitioner and respondent over the amount of depreciable bases petitioners claim with respect *177 to the patents and related technology. Paragraph 3 of the Agreement provided -- That [petitioner] will have an option to purchase the TOTAL ENERGY TECHNOLOGY including all results of [Nu Ava Foods'] work on the TOTAL ENERGY INVENTIONS including all rights, title and interest to all patents, lab notes, drawings, records, and related work; and that this option may be exercised within five years from the date of this agreement; and that the purchase price for said TOTAL ENERGY INVENTIONS and TECHNOLOGY shall be at least seven hundred and fifty million dollars payable in installments over the lives of U.S. and foreign patents. [Emphasis added.] The stated $ 750 million option price at which petitioner could repurchase the Total Energy Inventions allegedly was determined on the basis of what petitioner believed to be the earning capability of the inventions and technology. Although not completely clear, it appears that the $ 750 million option price was to be paid by petitioner only from royalties received on sales of the technology and derivative products. On December 29, 1972, petitioner and Ava Jane Miller entered into a second agreement that apparently was to serve as *178 an amendment to the August 1969 agreement with Nu Ava. Petitioner claims that in entering into the 1972 amendment to the Nu Ava agreement he exercised his repurchase option under the 1969 Nu Ava agreement to repurchase all right, title, and interest in the technology and inventions relating to the Total Energy Inventions. The 1972 amended agreement contained the following paragraph: REM [or petitioner] agrees to pay Nu Ava Foods, Inc. a royalty of ten percent (10%) of receipts by REM upon the use of or sale of patents and patent rights concerning said TOTAL ENERGY INVENTIONS AND TECHNOLOGIES until REM has paid Nu Ava Foods, Inc., an amount equal to twenty times the amount received by REM in royalties for Nu Ava Foods in the future from sales of said PROPRIETARY FOODS, and that payment by REM shall be at least seven hundred and fifty million dollars in accordance with the purchase option agreement which is attached hereto. [Emphasis added.] Petitioner claims that in 1972 he paid Nu Ava $ 1,000 under the amended Nu Ava agreement, and that since 1972 he has paid a total of $ 30,000 to Nu Ava pursuant to this agreement. Under the terms of the amended agreement, petitioner *179 conveyed use rights in certain food processing technology to Nu Ava in exchange for a 10 percent royalty from future sales of the technology and derivative products. Although the record reflects some checks from petitioner to Nu Ava, the purpose of the checks was not established. In 1974, petitioner discovered that the water aquifer underlying the Kansas schoolhouse property had become polluted. The water obtained from this aquifer apparently was critical to the use of the Kansas schoolhouse property for the research being conducted by petitioner and Nu Ava. On November 2, 1974, petitioner and Ava Jane Miller, on behalf of Nu Ava executed a second amendment to the 1969 agreement with Nu Ava. Under the terms of this amendment, Nu Ava was to convey all right and title to the food processing technology back to petitioner so that petitioner could take legal action against those responsible for pollution of the aquifer. The water pollution was not eliminated, and Nu Ava went out of business by the end of 1974. The second amended agreement required petitioner and REM to continue developing the food processing technology and directed that such technology would be transferred back *180 to Nu Ava when and if the pollution of the water aquifer was eliminated. Petitioner was to receive a 10 percent royalty on sales of the food technology following any transfer of that technology back to Nu Ava. On August 29, 1975, petitioner and REM filed a legal action against Altantic-Richfield, Mobile, and other oil companies seeking damages for the cost of cleaning up the pollution of the water aquifer under the Kansas schoolhouse property and for the loss of business profits, and seeking an injunction against the oil companies prohibiting them from allowing oil-field brine from their nearby drilling operations to runoff into the aquifer. Under Kansas law, a finding of temporary rather than permanent damages is necessary in order to hold a party liable for the cost of cleaning up pollution caused to a water source. The trial court granted defendants' motion for summary judgment on the issue of liability. In deciding a related statute of limitations issue, the trial court concluded that the damage to the aquifer was of a permanent nature. In McAlister v. Atlantic-Richfield, Mobile,233 Kan. 252, 662 P.2d 1203 (1983), the Kansas Supreme Court overturned *181 the trial court's holding on the issue of liability under the Oil Well Pollution Act, Kan. Stat. Ann. sec. 55-121 (1983) (now Kan. Stat. Ann. sec. 55-172 (1986 Supp.)) and affirmed the trial court's conclusion that the pollution of the aquifer resulted in permanent damages to the Kansas schoolhouse property. At trial and on subsequent appeal to the Kansas Supreme Court, McAlister failed to prove that the oil companies were liable for polluting the aquifer pursuant to Kan. Stat. Ann. sec. 55-121. TEC, VPHD Technology, and James C. Ray
Also in 1969, petitioner formed a company by the name of Trans-Energy Co. ("TEC") to raise capital for the manufacture and marketing of an invention petitioner called a Vapor Pressurized Hydrostatic Drive ("VPHD"). A VPHD was designed to improve engines for power boats. On June 18, 1970, petitioner and TEC entered into an agreement (the "TEC Agreement") with an Arizona boat manufacturing corporation by the name of Ray Industries for the further development of VPHD technology. Under the TEC Agreement, Ray Industries had an option to purchase all rights, title, and interest in the VPHD technology. If the option was exercised, petitioner was *182 to receive $ 5,000 cash, 20 percent of the stock in a development corporation to be formed by the parties, 30 percent of all royalties received by the development corporation from licensing the technology, and reimbursement of specified expenses. Ray Industries was owned by James C. Ray ("Ray"). In July of 1970, TEC was incorporated as a Delaware corporation in conjunction with the TEC Agreement. The stock of TEC apparently was owned 20 percent by petitioner and 80 percent by Ray. During the years 1970 through 1973, TEC purportedly expended large sums of money further developing the VPHD technology, and TEC thereby purportedly acquired the right to ownership of the VPHD technology. The record, however, contains no evidence that petitioner ever formally conveyed the VPHD technology to TEC. PSI Technology
In 1973, petitioner and Ray apparently entered into an agreement under which Ray was to purchase certain "PSI" technology from petitioner. PSI technology relates to the development of a type of fuel injection system utilizing improved spark plugs in internal combustion engines. Ray was to spend at least $ 1 million in marketing 250,000 PSI systems, and petitioner *183 was to receive royalties from the sales that petitioner estimated could reach $ 1 billion. Ray apparently paid $ 100,000 to petitioner in 1973. Petitioner claims he received the $ 100,000 from Ray as an advance royalty payment. The record contains no evidence that petitioner ever formally conveyed the PSI technology to Ray. Ray apparently entered into an agreement with petitioner and TEC in 1973 for the joint development of VPHD and PSI technology. Ray apparently advanced money to TEC and was committed to provide further funding for this endeavor. Dispute with James C. Ray
In early 1974, a dispute between petitioner and Ray arose over the management of TEC, the degree of progress made in developing and marketing petitioner's inventions, and the obligations each owed to TEC. As a result of this dispute, TEC terminated its efforts to further develop petitioner's inventions. On August 16, 1974, Ray obtained a preliminary injunction from the Superior Court of Arizona in Maricopa County enjoining petitioner from acting on behalf of TEC and ordering petitioner to turn over to TEC the VPHD and other patents and inventions, presumably including the PSI technology. In May *184 of 1975, litigation between petitioner and Ray escalated. Ray on behalf of TEC brought an action against petitioner in which he obtained an injunction prohibiting petitioner from transferring or disposing of any patents, inventions, and trade secrets which TEC claimed to own and an order compelling petitioner to turn over to TEC various patents and inventions. In another action, Ray also attempted to liquidate TEC in a bankruptcy proceeding and thereby -- as an 80 percent shareholder and holder of several claims against TEC -- to obtain title to much of the VPHD, PSI, and other technology presumably held by TEC in corporate solution. Not to be out done, petitioner filed a counterclaim against Ray and TEC for $ 1 billion in damages. The lawsuits between petitioner, Ray, and TEC were settled in September of 1976 when petitioner agreed to drop all claims against Ray and TEC in exchange for which Ray and TEC gave up all claims against petitioner, including rights to the VPHD and PSI technology and to other patents, inventions, and trade secrets. Under the settlement, Ray also relinquished his 80 percent interest in TEC. At the time of the settlement, petitioner executed a document *185 entitled "Purchase Agreement" by which he purported to exchange his claims against Ray and TEC along with all of his stock in TEC for all rights, title, and interest in the VPHD and PSI technology along with all other technology that was to have been transferred to TEC and Ray at an earlier time. John Lynch
John Lynch ("Lynch") expressed an interest in assisting petitioner develop and market his inventions. Lynch had worked for General Electric Corporation ("General Electric") from 1946 to 1968 and had friends at General Electric who he thought might assist in the development of petitioner's inventions. Lynch alleges to have obtained informal oral agreements from employees of General Electric to the effect that certain raw materials needed in the manufacture of petitioner's inventions (namely, tungsten and cobalt) would be provided by General Electric to petitioner at an unspecified price. Lynch hoped to negotiate a formal marketing agreement between General Electric and petitioner with respect to petitioner's inventions under which Lynch would receive significant commissions. On December 16, 1974, petitioner and Lynch entered into an agreement which they drafted without *186 assistance of counsel (the "Lynch Agreement"). Under this agreement, petitioner purportedly transferred to Lynch exclusive rights to promote, distribute, and sell VPHD and PSI technology for five years. As consideration, Lynch executed a promissory note in favor of petitioner for $ 804 million. Payments under this note were to be paid to petitioner, in part, from royalties on the sale of PSI systems. In the Lynch Agreement, royalties of $ 144 million from the sale of PSI spark plugs were projected, and the agreement stated "receipt of [the $ 144 million] is acknowledged by petitioner." The Lynch Agreement also stated that Lynch was to pay petitioner a royalty of $ 1 for each PSI distributor, wiring-fuel-connection harness, and fuel conditioning package Lynch sold. The Lynch Agreement estimated the amount of these future royalties to be $ 60 million, and the agreement stated that "receipt of [the $ 60 million] is acknowledged by petitioner." The Lynch Agreement stated further that petitioner acknowledges the receipt of $ 600 million from Lynch in payment for said exclusive VPHD use rights. No further evidence, however, of these payments totaling $ 804 million is contained *187 in the record. On February 1, 1976, petitioner and Lynch entered into an agreement (the,"Lynch Release") that purports to release petitioner and Lynch from their respective obligations under the December 16, 1974, Lynch Agreement. Under the terms of the Lynch Release, petitioner forgave Lynch's purported $ 804 million debt obligation to petitioner, and Lynch was to receive all rights, title, and interest in one of petitioner's inventions, United States Patent No. 3,756,306, referred to as the "Continuing Casting Apparatus With Temperature Control Including Successive Layers of Material." No further evidence concerning this patent is in the record. Temujin Co.
Petitioner's brother, Theodore McAlister, Jr., was an officer and part owner of Temujin Company, Inc. ("Temujin"), a foreign domiciled export corporation. Temujin was formed sometime before 1969. On December 1, 1969, petitioner drafted and signed a document purporting to be a promissory note in favor of Temujin under which petitioner allegedly was obligated to pay Temujin an amount not to exceed $ 1.2 million. The relevant paragraph of this agreement provided -- For Value Received including use rights to certain *188 electromechanical circuits and for approved developmental services, the undersigned Roy E. McAlister promises to pay on demand, or if no demand on 1 December 1979, to the order of the Temujin Company, a subsidiary of I. Irahishi Associates P.O. Box 187, Taipei, Taiwan or at such other place as the holder of this note may from time to time designate, such principal sum up to the maximum amount of $ 1,200,000 (one million, two hundred thousand dollars) as the holder hereof may advance to or for the benefit of the undersigned in accordance with the terms hereof. [Emphasis added.] The record, however, does not corroborate that petitioner received any advances from Temujin Co.
In October and November of 1979, petitioner wrote two checks in favor of Temujin in the respective amounts of $ 1,000 and $ 325,000. An explanation written on the $ 325,000 check indicated that the check represented a "use rights payment." The checks were drawn on petitioner's checking account at Great Western Bank. On December 6, 1979, a deposit of $ 327,966.44 was made into petitioner's account. At the time of the deposit, petitioner had a balance of less than $ 2,000 in the account on which the *189 checks were written. No explanation was given for the source of the $ 327,966.44 deposit. Theodore McAlister, Jr., endorsed the two checks, and on December 18, 1979, the two checks cleared through petitioner's account. Immediately following the payment of the two checks totaling $ 326,000, petitioner's account balance was less than $ 2,200. Ramada Inns
On August 1, 1976, petitioner entered into an agreement with Ramada Inns, Inc. ("Ramada") for the further development of some of petitioner's inventions relating to solar energy. Under this agreement, petitioner was to perform consulting services for Ramada for a minimum of six months for a fee of $ 8,000 a month, and Ramada received an option to purchase exclusive rights to specified "solar energy conversion technology." In the event Ramada exercised this option, petitioner was obligated to continue to assist Ramada in developing and marketing the technology for a fee of not less than $ 250,000 per year together with a supplemental fee of 50 percent of the royalties received by Ramada from licensing the solar energy technology, and six percent of the revenues from the sale or lease of solar collectors insofar as they *190 exceeded $ 250,000 per year. In the event Ramada exercised the option, the agreement also required Ramada to provide additional funding of approximately $ 60,000 for the further development of the solar energy inventions, and additional funding for manufacturing and advertising derivative products. On October 20, 1977, petitioner and Ramada entered into a second agreement that replaced their first agreement. Under the terms of the second agreement, petitioner granted to Ramada an exclusive license to manufacture, sell, and lease solar energy products developed from petitioner's solar energy inventions. The agreement provided that Ramada would construct and pay for a pilot manufacturing plant for production of the solar energy panels petitioner had designed. Petitioner was to provide full-time design, consulting, and supervisory services toward completion of the pilot manufacturing plant, and petitioner was to be paid a consulting fee of a minimum of $ 8,000 per month. The second Ramada agreement also provided that during operation of the pilot plant, petitioner was to receive 50 percent of all profits realized by Ramada on the sale of the solar panels, or the $ 8,000 per month *191 consulting fees, whichever was greater. The 1977 agreement with Ramada provided further that Ramada would finance a larger manufacturing plant to mass produce solar energy panels in the event sufficient orders were received. Upon commencement of mass production of solar energy panels, petitioner was to receive profit-sharing compensation after Ramada recovered its costs. In conjunction with the Ramada agreement, in the early 1980's petitioner applied for and received four United States patents relating to his solar energy inventions. Flint Hills
In 1978, petitioner and Lyle and Ula Barnes, to whom petitioner was related, formed Flint Hills Company, Inc. ("Flint Hills" ) for the purpose of further developing, manufacturing, and marketing petitioner's inventions relating to agricultural products. Petitioner owned 76 percent of the stock of Flint Hills. Petitioner's cost or investment in Flint Hills was not established. Also in 1978, petitioner purportedly transferred to Flint Hills rights to a patent in exchange for an interest bearing promissory note from Flint Hills in the principal amount of $ 266,626.66. Petitioner's cost or basis in the patent transferred to *192 Flint Hills was not established. For the years 1978, 1980, and 1981, Flint Hills filed Federal partnership returns of income, Forms 1065. For 1979, a corporate tax return was filed for Flint Hills. Flint Hills went into bankruptcy in 1984, and petitioner did not receive any payment on the $ 266,626.66 promissory note. Dome Ventures
On April 7, 1980, petitioner entered into an apparent loan agreement with Dome Ventures ("Dome"), an Arizona mining company under which petitioner purportedly loaned Dome $ 25,000. Petitioner's bank statement from Great Western Bank reflects that a check for $ 150,000 was paid to Dome from petitioner's account on April 15, 1980. Petitioner's bank statement also reflects that a check for $ 25,000 was paid to Dome from petitioner's account in June of 1980. On August 3, 1981, petitioner and Dome signed a document purporting to be a purchase by petitioner from Dome of 7,000 tons of fluorspar for $ 175,000. The document incorporates the prior loan agreement for $ 25,000. The document also characterizes the August 3, 1981, transaction as a loan by petitioner to Dome which loan in the amount of $ 175,000 was to be secured by and repaid with *193 transfers of fluorspar to petitioner. According to petitioner, he advanced the money to Dome to enable Dome to refine the fluorspar to a satisfactory grade. Dome apparently was to repay petitioner the $ 175,000 in cash or in fluorspar, provided a satisfactory grade of fluorspar could be supplied with a value of $ 175,000. Fluorspar apparently was a mineral used in some of petitioner's inventions. Petitioners' Tax Returns
On their joint Federal income tax returns for the years 1973 through 1982, petitioners claimed deductions and losses relating to petitioner's, patents, inventions, and vague contractual obligations. Petitioners also reported some significant income relating to the same activities. We summarize below in schedule format only the income and deduction items for each year that are in dispute in this case: 1977
1978
Income:
Wages from Ramada Inns
$      96,000.00 $      96,000.00 Gross Sales or Receipts
20,000.00 22,500.00 Flint Hills Income (Loss)
-     -     Sale of Patent to Flint
Hills
-     Expenses:
Research and Development
1,100.00 85,708.11 Legal Expenses (Kansas
Lawsuit)
1,548.86 229.11 Depreciation:
VPHD, PSI Technology,
and Other Technology
51,044,116.00 51,076,228.00 Kansas Schoolhouse
Property
24,403.60 1,712.00 Adjusted Gross Income
(Loss) *
(50,996,764.00)
(50,814,507.17)
Reported Income Tax
Liability
-0-     -0-     *194 1979
1980
Income:
Wages from Ramada Inns
$      96,000.00 $     121,000.00 Gross Sales or Receipts
-     12,000.00 Flint Hills Income (Loss)
(34,450.09)
(40,181.00)
Sale of Patent to Flint
Hills
-     315,000.00 Expenses:
Research and Development
3,297.94 190,900.00 Legal Expenses (Kansas
Lawsuit)
643.80 6,779.76 Depreciation:
VPHD, PSI Technology,
and Other Technology
51,093,751.00 51,088,257.00 Kansas Schoolhouse
Property
23,938.00 43,515.00 Adjusted Gross Income
(Loss) *
(51,124,149.00)
(50,918,275.00)
Reported Income Tax
Liability
-0-     -0-     The large depreciation expenses petitioners claimed on their tax returns relate primarily to the different *195 patents and related technology petitioner alleges to have acquired. The large tax bases claimed in these assets are attributable to petitioner's incredibly optimistic estimates of the fair market value thereof and to the various contracts petitioner entered into. Beginning with their 1973 joint Federal income tax return, petitioner claimed a depreciable basis of $ 450 million in the VPHD technology and a depreciable basis of $ 300 million in the PSI technology. The straight-line method of depreciation and a useful life of 17 years were used to compute the amount of depreciation expenses claimed. The total claimed tax basis of $ 750 million in these two technologies apparently was based on petitioner's contention that he incurred a cost of $ 750 million with respect to the technology packages by exercising the repurchase option for the Total Energy Inventions as set forth in the first amended agreement between petitioner and Nu Ava. On petitioners' 1974 tax return, various adjustments were made to the claimed tax basis in the VPHD and PSI technologies. The basis of the PSI technology was reduced by $ 50 million to $ 250 million to reflect petitioner's opinion of the decrease in *196 the value oi that technology due to what petitioner regarded as a cloud on the ownership of the technology caused by petitioner's dispute with Ray. On petitioners' 1975 tax return, the tax basis for the VPHD technology was increased by $ 50 million to $ 500 million to reflect what petitioner regarded as the "increased market potential" for the technology and a corresponding increased obligation to Nu Ava. On petitioners' 1976 tax return, the tax bases for the various patents and related technology was reported as follows: $ 500 million for VPHD, $ 350 million for PSI, $ 1.5 million for food processing technology, and $ 1.25 million for medical related technology. The $ 100 million increase in the basis claimed on the 1976 return with respect to the PSI technology was attributable to petitioner's opinion that repercussions from the oil embargo rendered the PSI technology that much more valuable and that petitioner had a corresponding increased obligation to Nu Ava. On petitioners' 1977 tax return, the tax basis claimed with respect to the PSI technology was raised $ 15 million over the amount reported on their 1976 tax return to reflect petitioner's belief that the commercial *197 value of that technology as well as his obligation to Nu Ava had increased. On petitioners' 1978 and 1979 tax returns, petitioners again increased the amount of taxable basis reported for the patents and technology for the same reasons stated above. On petitioners' 1980 tax return, petitioners increased the amount of the total taxable basis claimed for the patents and technology by $ 325,000 to reflect the payment made to Temujin. A summary of the total tax basis and total depreciation deductions claimed by petitioners on their joint Federal income tax returns for the years 1973 through 1982 with respect to petitioner's various inventions is set forth below: Total
Claimed Depreciation
Year
Claimed Basis
Deductions
1973
$ 750,000,000 $ 26,470,588  1974
700,000,000
41,176,470
1975
750,000,000
44,117,646
1976
852,750,000
50,161,763
1977
867,750,000
51,044,116
1978
867,950,000
51,074,516
1979
868,175,384
51,093,751
1980
868,500,384
51,088,257
1981
868,500,384
51,088,257
1982
866,500,384
50,968,726
Upon audit, respondent was faced with petitioner's adamant refusal to allow respondent's agents to examine any of petitioner's *198 records -- financial as well as scientific -- for fear that some of petitioner's trade secrets might be stolen. Respondent, therefore, disallowed most of the claimed expenses and issued the notices of deficiency at issue in this case. During this litigation and after much urging by respondent and the Court, petitioner finally allowed respondent's agent to examine his records. As a result of that examination, respondent allowed petitioners significant deductions for the following types of expenses: Travel, depreciation, research and development, entertainment, taxes, utilities, legal fees, and interest. Respondent also allowed petitioner a total depreciable cost basis for tax purposes in his various patents and related technology for each of the years 1977 through 1982 as follows: Year
Total-Tax Basis
1977
$ 23,612
1978
9,229
1979
6,257
1980
30,350
1981
2,553
1982
3,957
Based on the above total tax basis, a straight-line method of depreciation and generally a 17-year useful life, respondent allowed petitioner the following depreciation deductions: Depreciation
Year
Deductions Allowed
1977
$  3,454
1978
5,012
1979
6,282
1980
9,797
1981
10,041
1982
10,332
*199 Respondent allowed no portion of the $ 57,889 petitioner claimed as depreciation on buildings. Respondent allowed $ 72,684 of the total $ 99,902 petitioner claimed as depreciation on equipment. Research and development expenses were allowed by respondent in the following amounts: R & D Expenses
Year
Allowed
1977
$    600
1978
7,194
1979
13,530
1980
15,423
1981
5,275
1982
1,725
Legal expenses allowed by respondent were as follows: Legal Expenses Relating To
Year
Patents
General
1977
$ 25,000
$   -0-
1978
12,000
182
1979
15,000
557
1980
30,000
288
1981
-0-
3,977
1982
1,000
4,455
The above "patent-related" legal expenses were capitalized by respondent as part of the costs of the patents, and the "general" legal expenses were allowed as current deductions. An additional $ 11,249 is now claimed by petitioner as legal expenses relating to the lawsuit concerning the pollution of the Kansas schoolhouse property. Those expenses were disallowed by respondent as personal, nonbusiness expenses. Although *200 not claimed as a deduction on petitioners' 1979 tax return, petitioner now claims that the check he executed in favor of Temujin in 1979 in the amount of $ 325,000 represented an interest payment which now should be allowed as additional interest deductions on his and his wife's 1979 tax return. As indicated above, petitioners alternatively claim they should be allowed to capitalize the $ 325,000 payment to Temujin as a cost of research and development on their 1980 tax return. On petitioners' 1980 tax return, petitioners claimed a deduction for cost of goods sold in the amount of $ 175,000 with respect to the transfer of $ 175,000 to Dome in 1980. Accrued on petitioners' 1980 tax return was $ 315,000 in income relating to the 1978 purported sale of a patent by petitioner to Flint Hills. Petitioners now claim that the $ 315,000 never was paid to petitioner and that it was accrued erroneously on the 1980 tax return. On petitioners' 1979 and 1980 tax returns, petitioners claimed a distributive share of net operating losses with respect to Flint Hills in the amounts of $ 34,450.09 and $ 40,181, respectively. OPINION Petitioner's Tax Bases In Patents and Related Technology
*201 Under sections 167(g), 1011, and 1012, the cost basis of property for depreciation purposes is determined by the cost of the property, and a taxpayer's cost generally includes valid indebtedness incurred in acquiring the property. Sec. 1.1012-1, Income Tax Regs.; Crane v. Commissioner,331 U.S. 1 (1947); Waddell v. Commissioner,86 T.C. 848, 898 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Blackstone Theatre Co. v. Commissioner,12 T.C. 801, 804 (1949). Indebtedness, however, which is not genuine and which does not represent a fixed and definite obligation to pay does not add to a taxpayer's basis in property. Waddell v. Commissioner, supra.See also Estate of Franklin v. Commissioner,544 F.2d 1045, 1047-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Denver & Rio Grande Western R.R. Co. v. United States,205 Ct. Cl. 597, 505 F.2d 1266, 1270-1271 (1974); Hulter v. Commissioner,91 T.C. 371 (1988); Graf v. Commissioner,80 T.C. 944 (1983). *202 In analyzing the genuineness of purported indebtedness, the substance of the transaction controls, not its form. Commissioner v. Tower,327 U.S. 280, 291-292 (1946); Gregory v. Helvering,293 U.S. 465, 469 (1935). Factors that are considered in analyzing whether indebtedness is genuine are: (1) Whether the creditor investigated the financial status and credit worthiness of the debtor, Capek v. Commissioner,86 T.C. 14, 48-49 (1986); (2) the debtor's ability to make payments on the indebtedness, Burns v. Commissioner,78 T.C. 185, 212 (1982); (3) the likelihood of repayment of the indebtedness by the debtor, Packard v. Commissioner,85 T.C. 397 (1985); (4) compliance with regulatory requirements governing the transaction, Frank Lyon Co. v. United States,435 U.S. 561 (1978); (5) the presence of arm's-length negotiations between the debtor and creditor, Frank Lyon Co. v. United States, supra; (6) the sufficiency of the debtor's assets to satisfy the indebtedness in the event the investment for which the loan funds were to be applied is not successful, Frank Lyon Co. v. United States, supra. *203 Petitioner contends that his obligation or indebtedness to pay Nu Ava a minimum of $ 750 million for the technology [3] relating to the Total Energy Inventions resulted from a valid, arm's-length transaction, and therefore, that the indebtedness provides him with a cost basis therein of at least $ 750 million. Respondent contends that petitioner did not establish that he made any payment on the purported indebtedness to Nu Ava, and respondent contends that the indebtedness was not genuine. For the reasons stated below, we agree with respondent. The "minimum purchase price" of $ 750 million reflected in paragraph 3 of the agreement between petitioner and Nu Ava represents nothing more than a portion of the profits petitioner estimated might be realized from the sale of the Total Energy Inventions and derivative products. Petitioner did not have $ 750 million in cash or assets in 1969 when the agreement was entered into, nor did he have that amount when he claims to have *204 exercised the option by entering into the supplemental agreement with Nu Ava in 1972. Petitioner paid only $ 1,000 to Nu Ava in 1972, the year in which he claims he exercised the repurchase option. Since then, petitioner claims to have paid Nu Ava only $ 30,000 under the terms of the amended agreement although there is no conclusive evidence corroborating that payment. Petitioner treated Nu Ava as his alter ego, rather than as a creditor. Through his relatives who nominally controlled Nu Ava, petitioner retained essentially the same rights and interests in the Total Energy Inventions technology that he had before entering into the agreements with Nu Ava. For example, petitioner attempted to sell the PSI technology to Ray during the period of time that Nu Ava allegedly owned the technology. The nongenuine nature of petitioner's $ 750 million purported indebtedness to Nu Ava is underscored by the absence of any proof that Nu Ava provided any valid consideration in exchange for petitioner's purported transfer to it of the technology. In essence, we doubt the validity of the transfer of the Total Energy Inventions technology to Nu Ava. Any payment by petitioner of $ 750 million *205 to Nu Ava was highly contingent and speculative. All payments and petitioner's indebtedness with respect thereto were totally dependent on future, speculative sales of products derived from petitioner's patents and inventions. If the indebtedness to Nu Ava is not recognized for tax depreciation purposes, petitioner argues alternatively that the settlement of the lawsuit with Ray and TEC represented an exchange of property thereby establishing petitioner's total basis in the technology. Petitioner contends that the value of his damage claim against Ray and TEC exchanged in the settlement is either the amount of the proceeds petitioner expected to receive from his agreement with Lynch or the amount of proceeds petitioner expected to receive from his agreement with Ray and TEC. Petitioner cites Brinckerhoff v. Commissioner,8 T.C. 1045 (1947), affd. 168 F.2d 436 (2d Cir. 1948), and other cases, some of which support the proposition that a taxpayer's basis in property acquired in exchange for his cash claim may be measured by the value of the claim relinquished. Petitioner therefore argues that his basis in the patents and related technology that *206 he received by settling his litigation with Ray and TEC is the value of the damage claim he surrendered as a compromise payment in that settlement, which claim represented the loss of anticipated profits under his agreement with Lynch (namely, $ 804 million) or, alternatively, the loss of anticipated profits from his agreement with Ray and TEC (namely, $ 1 billion). We already have concluded, however, that petitioner's purported indebtedness to Nu Ava of $ 750 million was not genuine. For the same reasons, we conclude that Ray's, Lynch's, and TEC's purported indebtedness to petitioner were not genuine and therefore that petitioner had no valid legal claims against Ray and TEC with a value of $ 804 million or $ 1 billion. Any such purported indebtedness was not genuine, but was conditional, speculative, based on conjecture and not negotiated at arm's length. Accordingly, the settlement of the lawsuits between petitioner, Ray, and TEC, and the property rights exchanged in connection with the settlement do not provide petitioner with any additional depreciable tax basis in his patents and related technology, or other property. Petitioner argues that the $ 1.2 million loan agreement *207 he signed with Temujin represented a genuine indebtedness which increased his depreciable basis in the patents and related technology he owned and developed. That loan agreement, however, merely represented petitioner's agreement to repay with interest any funds that Temujin may choose to advance subsequent to the execution of the agreement. The agreement was dated December 1, 1969, and was signed only by petitioner. Neither Theodore McAlister, Jr., nor any other person testified on behalf of Temujin. A company capable of loaning $ 1.2 million would likely have books and records reflecting such a transaction, but none were submitted at trial. Petitioner testified that Temujin transferred technology to him in exchange for his indebtedness to pay $ 1.2 million. According to petitioner, the technology Temujin transferred to him was essential to the development of the Total Energy Inventions. At trial, petitioner was vague and evasive when asked to describe this technology, and no evidence is contained in the record corroborating the occurrence of any such transfer. Because petitioner has failed to provide evidence demonstrating that he had a genuine indebtedness to pay $ 1.2 million *208 to Temujin, petitioner's purported indebtedness to Temujin must be disregarded for Federal income tax purposes. $ 325,000 Check To Temujin
Petitioner argues that in 1979, he paid $ 325,000 to Temujin and that the payment represented a deductible interest expense or, alternatively, an amortizable capital expenditure for the acquisition and or development of patents and technology. Respondent regards this purported $ 325,000 payment as a sham with respect to which neither an interest deduction nor an addition to basis is appropriate. As explained in our findings of fact, on November 18, 1979, petitioner wrote a check on his account at Great Western Bank for $ 325,000 in favor of Temujin. On December 6, 1979, $ 325,000 was credited to petitioner's account at Great Western Bank. On December 18, 1979, the check was charged to petitioner's account for payment. The $ 325,000 was not deducted as an interest expense on petitioners' 1979 tax return. On their 1980 tax return, petitioners did reflect the $ 325,000 as a part of their total depreciable cost basis in petitioner's patents and related technology. On the face of the check was a notation written by petitioner that *209 the check was for "use rights payment." During the audit by respondent, petitioner added the letters "int" on the face of the check to reflect petitioner's belief that the check, at that time, represented a payment of interest. The interest character of the $ 325,000 check has not been established. The check has not been associated with any genuine indebtedness, and the claimed interest deduction is disallowed. As indicated, respondent also regards the $ 325,000 check as a sham and argues that petitioner's depreciable cost bases in his patents and related technology should not be increased by the $ 325,000 check. Respondent relies primarily on the fact that petitioner's bank account on which the check was drawn did not normally have a balance sufficient to cover the $ 325,000 check and that a week or two before petitioner wrote the check, a large unexplained deposit was made into petitioner's account apparently in order to cover the check. We agree with respondent that the documentation associated with this item, combined with the non-arm's-length nature of the relationship between petitioner, his brother and Temujin, and the apparent lack of any consideration or legitimate *210 business purpose associated with the check, raise too many questions concerning the check for the amount thereof to be recognized as a cost of petitioner's acquisition or development of depreciable patents and related technology. Depreciation of Kansas Schoolhouse Property and Related Fixtures and Equipment
Petitioners argue that for 1977 and 1978 they are entitled to additional depreciation deductions with regard to the Kansas schoolhouse property and related fixtures and equipment in excess of amounts allowed by respondent. On Schedule C of their 1977 Federal income tax return, petitioners reported the building and equipment as having been acquired in 1966 and 1967, with a useful life of 10 years, the last of which would have been 1977. On Schedule C attached to their 1978 Federal income tax return, petitioners reported the same Kansas schoolhouse property and related fixtures and equipment as acquired in 1976 to 1977. Without corroborating evidence to establish that petitioner purchased buildings, fixtures, or equipment in 1977 and without evidence of the cost or nature of the items, petitioners may not increase their depreciable cost with respect to this property *211 over the amounts allowed by respondent. The record contains only a copy of a joint tenancy warranty deed reflecting that petitioners in 1975 acquired certain unspecified real property in Harvey County, Kansas in exchange for one dollar and other consideration. We sustain respondent's adjustments in this regard. Litigation Expenses Relating to Pollution of the Water Aquifer of the Kansas Schoolhouse Property
Litigation expenses are deductible as ordinary and necessary expenses under section 162 if the origin and character of the dispute which led to the expenses is directly connected with the taxpayer's business. Rafter v. Commissioner,60 T.C. 1, 8 (1973), affd. without published opinion 489 F.2d 752 (2d Cir. 1974). The expenses relating to the litigation over the pollution of the water aquifer of the Kansas schoolhouse property were directly related to petitioner's trade or business of researching, developing, and marketing new technology and inventions. Petitioner continued to use this property in connection with his research and development *212 business during the years the property was leased to Nu Ava, and the pollution of the aquifer appears to have jeopardized that aspect of petitioner's business. We allow petitioner additional ordinary and necessary business expenses with respect to the $ 11,249.40 in litigation expenses. Substantiation of Research and Development Expenses
Petitioner claims that respondent erroneously disallowed research and development expenses and miscellaneous related expenses incurred in connection with the research and development of petitioner's inventions. Respondent has reviewed the available records and allowed petitioner deductions for significant research and development expenses as well as related expenses such as travel and entertainment expenses that appeared to be related to petitioner's research and development work. Respondent allowed petitioner to treat proven research and development expenses he paid that were not attributable to research resulting in a patent as current expenses under section 174(a). Respondent allowed petitioner to capitalize and depreciate substantiated research and development expenses that were paid with respect to research that resulted in a patent.
*213 Other expenses that petitioner claims as research and development expenses were not allowed by respondent on the ground that they were not substantiated or on the ground that their character as qualifying research and development expenses under section 174(a) or as allowable ordinary and necessary business expenses under section 162 was not established. The bulk of these expenses remaining at issue relate to expenses that allegedly were paid to petitioner's relatives or to the various companies in which petitioner had a substantial ownership interest. These additional expenses and their nature have not been substantiated by petitioners. We sustain respondent's adjustments in their entirety with regard to the research and development and related expenses. Payments Received From Ramada
Under his contracts with Ramada, petitioner was to be paid by Ramada at least $ 8,000 a month. Total payments received by petitioner from Ramada in the years 1977 through 1981 were as follows: 1977
$  96,000
1978
$  96,000
1979
$  96,000
1980
$ 121,000
1981
$   8,000
*214 Section 1235(a) provides generally that an inventor who transfers substantial rights to patents or proprietary rights will be treated as having made a sale or exchange of a capital asset. Capital gain treatment is available under section 1235(a) regardless of whether the payments were received periodically and regardless of whether the payments were contingent on the productivity, use, or disposition of the patent. Petitioners argue that the above payments qualify for capital gain treatment under section 1235(a). Respondent argues that the payments were compensation for consulting services rendered by petitioner to Ramada Inns and that they do not qualify for capital gain treatment under section 1235(a). Petitioner's agreements with Ramada were drafted by attorneys, and they reflect in detail the nature of the payments petitioner was to receive. Ramada never licensed, sublicensed, or sold the solar energy technology it received from petitioner, which is the only situation under which petitioner would have received any compensation from Ramada other than consulting fees under either the 1976 or 1977 agreements. Petitioner was not entitled to payments from Ramada other than as *215 compensation for his personal services and that is what the payments in question represented. As such, they are taxable to petitioner as ordinary income. We also note that the payments to petitioner generally were reflected by Ramada as payments of miscellaneous income on the Forms 1099 that were issued to petitioner each year, and petitioner reported the payments as ordinary income on his and his wife's Federal income tax returns each year with the exception of 1981, on which return the payments were reflected as royalty income. Losses Relating to Flint Hills
Respondent disallowed ordinary losses claimed by petitioner on his and his wife's 1979 and 1980 Federal income tax returns with respect to his investment in Flint Hills. For 1979, Flint Hills filed a corporate tax return. No subchapter S election under section 1372(a) was filed by Flint Hills, and petitioners' attempt to claim a portion of Flint Hills corporate losses in 1979 must be rejected. For 1980, Flint Hills filed a partnership return. Petitioner, however, has not established his tax basis for his investment in Flint Hills. Accordingly, his basis therein will be treated as zero for 1979 and 1980 and, *216 under section 704(d), petitioners' claimed partnership losses in Flint Hills must be rejected. We already have noted that respondent has conceded all adjustments for 1981, including the adjustments for that year relating to Flint Hills. Accrual of $ 315,000 Due Petitioner From Flint Hills
Petitioner argues that the accrual of $ 315,000 on his and his wife's 1980 Federal income tax return with respect to the purported sale of a patent to Flint Hills was erroneous. Petitioner argues that he never was paid the $ 315,000 and that Flint Hills and its president, Lyle Barnes, went bankrupt in 1984 and were discharged of this debt. Respondent argues that the $ 315,000 was due petitioner as a result of the 1978 sale of a patent by petitioner to Flint Hills and that petitioner as an accrual basis taxpayer for 1980 properly accrued the $ 315,000. Although the record is not complete regarding the underlying transaction which gave rise to this accrued item, the little we understand of the transaction leads us to conclude that the transaction with Flint Hills and the amounts due with respect thereto were similar to many of the other transactions at issue in this case. Evidence *217 in the record corroborates that the $ 315,000 was not received by petitioner. Related parties negotiated the debt. The principal amount of the debt appears to have been based on speculative values for the property purportedly sold. In light of the non-arm's-length relationship between petitioner, Flint Hills, and Lyle Barnes, we conclude that this debt was not genuine, and that petitioner's rights with regard thereto were too speculative and too indefinite to require an accrual of any amount of income with regard thereto until actually received. Sec. 1.451-1, Income Tax Regs.; Maryland Shipbuilding and Drydock Co. v. United States,409 F.2d 1363, 1366 (Ct. Cl. 1969). Dome Ventures: 1980 Cost of Goods Sold Deduction and Increase in Basis
Respondent disallowed for 1980 petitioners' claimed $ 175,000 cost of goods sold deduction that relates to alleged purchases of fluorspar from Dome. The only formal agreement in 1980 between petitioner and Dome reflected a $ 25,000 loan. Petitioner's banking records, however, do indicate that petitioner transferred $ 175,000 to Dome in April and June of 1980. The August 3, 1981, agreement *218 between petitioner and Dome describes a purchase of fluorspar for $ 175,000, however, the agreement also describes the transaction as a loan of $ 175,000 the repayment of which was to be made with fluorspar. Based on the record before us, we conclude that the transactions between petitioner and Dome in 1980 must be treated as loans. Accordingly, petitioner is not entitled to the claimed cost of goods sold deduction, nor to the claimed increase in his basis for the amounts in dispute. We sustain respondent's adjustments for 1980 with regard to petitioner's transactions with Dome. Additions to Tax for 1977, 1978, 1979, and 1980
Where any part of a taxpayer's underpayment of income tax is due to his negligence or intentional disregard of rules and regulations, an amount equal to five percent of the underpayment shall be added to the tax under the authority of section 6653(a). For purposes of section 6653(a), negligence is defined as a lack of due care or failure to do what a reasonable and prudent person would do under like circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985), *219 citing Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967). Respondent's determination of a taxpayer's negligence or intentional disregard of rules and regulations is prima facie correct, and the taxpayer bears the burden of proving that he acted reasonably, prudently, and with due care in preparing and filing his Federal income tax returns. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioners displayed countless violations of respondent's rules and regulations in preparing and filing their Federal income tax returns for the years in issue. For example, petitioners claimed depreciation deductions on the basis of grossly inflated tax bases, and petitioners' books and recordkeeping were practically nonexistent. We hold that petitioners are liable for additions to tax under section 6653(a) for the years 1977, 1978, 1979, and 1980. Due to concessions, Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
*. 50 percent of interest due on the full deficiency for each of the years in issue. ↩
2. Shop-rights have been explained as follows: where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a nonexclusive right to practice the invention. * * * [In United States v. Dubilier Condensor Corp.,289 U.S. 178, 188 (1933).] Under the shop-rights principle, an invention apparently remains the property of the employee who created it along with the right, conferred by the patent, to exclude all others, with the exception of the employer, from using or accruing benefits from the invention.↩
*. As explained, items included in petitioners' income and expenses for each year but not in dispute are not shown in the above schedule. The adjusted gross income or loss figure shown in the schedule for each year reflects the amount of such income or loss for each year per petitioners' tax returns.↩
3. The word "technology" here and elsewhere in this opinion refers generally to what petitioner describes as a combination of patents, inventions, proprietary rights, related technology, and trade secrets.↩