HARRY N. RAY AND JOYCE M. RAY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ray v. Commissioner
Docket Nos. 5180-87, 24444-88
United States Tax Court
T.C. Memo 1991-106; 1991 Tax Ct. Memo LEXIS 126; 61 T.C.M. (CCH) 2122; T.C.M. (RIA) 91106; March 12, 1991, Filed *126 Decisions will be entered under Rule 155.
Jay B. Kelly, for petitioner Joyce M. Ray. Ross A. Sussman, for petitioner Harry N. Ray and Harry N. Ray, pro se. Gail K. Gibson, Ellen T. Friberg, and Genelle F. Forsberg, for the respondent. COLVIN, Judge. COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION After concessions, the issues for decision are: (1) Whether payments to Iona Ray of $ 4,958, $ 7,200, $ 7,200, and $ 7,200 in 1975, 1976, 1977, and 1979, respectively, were alimony or payments for a property settlement pursuant to the terms of the divorce decree between Iona Ray and Harry Ray. We hold that the payments were part of a property settlement and are not deductible by petitioners as alimony. (2) Whether petitioners are entitled to a short-term capital loss carryforward of $ 2,000 relating to Lil' Andy's, Inc., in 1977. We hold that they are not because they failed to prove that the debt was bona fide, or in what year it became worthless. (3) Whether petitioners are entitled to claim corporate losses from Fun Machines, Inc., of $ 78,851, $ 44,379, and $ 45,549, respectively, in 1982, 1983, and 1984. We hold that they are not because they failed *127 to establish that losses were sustained by Fun Machines in those years. (4) Whether petitioners are entitled to claim corporate losses from Harry Ray, Ltd., of $ 15,877.92 and $ 11,827.84, respectively, in 1976 and 1977. We hold that they may not because they had insufficient basis in Harry Ray, Ltd., in those years. (5) Whether petitioners received interest income from John Beckman in the amounts of $ 7,044, $ 1,500, and $ 12,663, respectively, for taxable years 1982, 1983, and 1984, which they failed to report. We hold that they did. (6) Whether petitioners had a capital loss of $ 3,000 and a capital gain of $ 4,981 as claimed on their 1982 and 1984 returns, or capital gains of $ 15,643 and $ 20,506 as determined in the notice of deficiency. We hold that petitioners had capital gains of $ 5,726 and $ 6,837 in 1982 and 1984, respectively. (7) Whether petitioners are entitled to claim investment tax credits of $ 9,719, $ 3,247, and $ 10,720 in 1982, 1983, and 1984, respectively. We hold that they are not because they failed to establish that the property qualified for an investment tax credit. (8) Whether petitioners are entitled to a home office deduction on their 1976, *128 1977, and 1979 returns. We hold that they are not. (9) Whether petitioners are subject to additions to tax in the amounts of $ 2,114, $ 3,440, and $ 4,282 for taxable years 1982, 1983, and 1984, respectively, for substantial understatement of tax under section 6661. [1] We hold that they are not. (10) Whether Joyce Ray is entitled to relief from liability for the increases in income tax and additions to tax for taxable years 1975, 1976, 1977, 1979, 1982, 1983, and 1984 under section 6013(e) as an innocent spouse. We hold that she is not an innocent spouse within the meaning of section 6013(e). (11) Whether petitioners are individually and jointly responsible for the filing of false returns with an intent to evade tax for taxable years 1975, 1976, 1977, 1979, 1982, 1983, and 1984 under section 6653(b). We hold that petitioner Harry *129 Ray is liable for the addition to tax for fraud, but that petitioner Joyce Ray is not. Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Sec.
Sec.
Sec.
Sec.
Year
Income Tax
6653(b)
6653(b)(1)
6653(b)(2)
6661
1975
$ 1,781.00 $ 6,053.50
--  --
-- 1976
7,591.44
4,679.72
--  --
-- 1977
5,679.00
2,839.50
--  --
-- 1979
4,644.00
2,322.00
--   --
-- 1982
14,248.00
-- $ 7,124 * $ 2,114
1983
13,761.00
-- 6,881
* 3,440
1984
24,388.00
-- 12,194
* 4,282
Respondent concedes that petitioners had sufficient basis in Harry Ray, Ltd., to deduct losses in taxable years 1982 and 1984. Respondent further concedes that if we decide that petitioners are not liable for the addition to tax under section 6653(b) for 1975, 1976, 1977, and 1979, the deficiency determinations for those years *130 are barred by the statute of limitations pursuant to section 6501(a). Finally, respondent failed to make any argument at trial or on brief with respect to the section 6661(a) addition to tax for substantial understatement of tax, which is therefore deemed abandoned. We find for petitioners on this issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Background
Petitioners resided in Bloomington, Minnesota, at the time they filed the petitions in this case. Petitioners filed joint Federal income tax returns for 1975, 1976, 1977, 1979, 1982, 1983, and 1984. Petitioners reported their income and expenses on a cash basis. Petitioner Harry N. Ray (hereafter petitioner) was admitted to the practice of law in Minnesota in 1953. During the mid-1950's, petitioner began preparing a few tax returns a year and continued to do so every year thereafter. During the years in dispute, his practice included representing clients in Federal income tax matters. Petitioner Joyce M. Ray was employed as a secretary in petitioner's law practice during the years in dispute. She had been so employed since 1960. She is a high school graduate, and has worked *131 solely as a secretary since her graduation. During the years 1979, 1982, 1983, and 1984, petitioner conducted his law practice as an employee of his wholly owned corporation, Harry N. Ray, Ltd. (hereafter Harry Ray, Ltd.). During the same years Joyce was also employed by Harry Ray, Ltd. 2. The Divorce Decree and Alimony Payments
On December 31, 1973, petitioner filed a complaint seeking a decree of divorce from Iona Ray, to whom he had been married since 1942. Petitioner represented himself in the divorce proceedings. Iona Ray was represented by an attorney, D. Patrick McCullough (hereafter McCullough). Petitioner was divorced from Iona Ray by virtue of a judgment and decree dated July 2, 1974, which was filed with the Dakota County Court. The judgment and decree provided at paragraph 10 that Iona Ray "is awarded no alimony and waives her rights to any past, present or future alimony." Paragraph six of the judgment and decree awarded Iona Ray child support for the three minor children then living at home. On November 9, 1973, petitioner sent a letter to McCullough prior to filing the divorce complaint, which included the following language: "Mrs. [Iona] Ray would have *132 to waive her right to past, present and future alimony." In a letter to petitioner dated November 21, 1973, McCullough discussed the terms of the divorce as proposed in petitioner's letter of November 9, 1973. McCullough assumed that the $ 600 a month stipend in lieu of a 50-percent property split was in addition to one-half of the equity in the homestead. He also assumed that petitioner's reluctance to pay alimony included a reluctance to pay alimony in the future. In a letter dated November 29, 1973, petitioner told McCullough that he did not anticipate any tax consequences to Iona Ray unless the $ 600 monthly payments to her were considered alimony. He also stated that he did not want to pay alimony and would not allow the decree to reserve the right to alimony in the future. The stipulation filed with the Dakota County Court on May 26, 1974, was signed by petitioner, Iona Ray, and McCullough. It provided that Iona Ray would be awarded no alimony and waived her rights to any past, present, or future alimony. Paragraph 11 of the judgment and decree dissolving the marriage between petitioner and Iona Ray awarded their interest in four properties to petitioner. Iona Ray was *133 to execute a quitclaim deed to the four properties, and petitioner was to release her from all obligations with respect to the properties. Paragraph 12 of the judgment and decree [2] awarded to petitioner four other parcels of real estate and provided that net proceeds after income taxes, encumbrances, and costs of sale would be placed in an interest-bearing investment for the life of Iona Ray or such other period as she was paid $ 600 a month. Interest from the account could be used to pay the $ 600 a month due from petitioner. This monthly amount was designated as a settlement in lieu of Iona Ray's interest in said properties and subject to her option of accepting in lieu of the payment 50 percent of the net proceeds after income taxes, encumbrances, and costs of sale. The provision further stated that if Iona Ray remarried, her monthly allotment would cease and she would receive one-half of the net proceeds of the interest of the parties after income taxes, encumbrances, and costs of sale due thereon on the described real estate, less any amounts already paid. *134 Paragraph 15 of the judgment and decree [3] provided that during the time Iona Ray and the minor children occupied the family homestead, Iona Ray would receive as support a maximum of $ 1,350 per month. In addition, it provided that petitioner could claim a personal exemption for Iona Ray unless she had taxable income in excess of $ 600 per month. *135 Iona Ray could not have supported herself if she had received half of the property that she and petitioner owned at the time of the divorce since much of it was undeveloped. McCullough advised Iona Ray that the $ 600 a month payment she received from petitioner would not be taxable. He did not report those payments as income on the tax returns he prepared for her after the divorce. Petitioners claimed alimony deductions for payments made to Iona Ray of $ 7,600, $ 7,200, $ 7,200, and $ 7,200, respectively, on their 1975, 1976, 1977, and 1979 returns. During 1976, 1977, and 1979, petitioner made payments to Iona Ray of $ 600 per month. 3. Respondent's Examination of Petitioners
Revenue Agent Jim Brandenburg met with petitioner on June 20, 1977, in connection with the examination of petitioners' 1975 tax return. At that time petitioner submitted an altered version (the altered document) of the judgment and decree. The altered document deleted paragraph 10, which provided that Iona Ray would receive no alimony. The text of paragraph 11 appeared as paragraph 10 in its place. Tax Auditor Bruce Nordin met with petitioner on May 23, 1980, in connection with the examination *136 of petitioners' 1978 return. At that time petitioner submitted what was purported to be a copy of the judgment and decree, but which was actually another copy of the altered document. In mid-1980, the examination of petitioners' 1978 return was transferred from Tax Auditor Bruce Nordin to Tax Auditor Mary Lou Oreschnick. Agent Oreschnick met with petitioner on October 1, 1980, and asked for a certified copy of his judgment and decree. By letter dated October 15, 1980, petitioners forwarded what was purported to be a certified copy of the judgment and decree to Tax Auditor Oreschnick. This was another copy of the altered document. There is no reference to an award of alimony to Iona Ray in any of the three copies of the altered document petitioner gave to respondent. Respondent also asked petitioners to provide documents showing how the alimony deduction claimed on their 1975 return was determined. Petitioners provided a copy of a letter dated February 2, 1975, addressed to Mrs. Iona D. Ray. The letter stated that a check for $ 1,250 was enclosed. Iona Ray never received the letter. Harry told Special Agent Brozen that he had paid the amount shown in the letter but had forgotten *137 to deduct it on his return as additional alimony. Agent Brandenburg determined that the $ 7,600 alimony deducted by petitioners on their 1975 return was composed of the following: Direct Payments to Iona Ray
$ 12,121 Payments to Twin City Federal
2,954 Payment from Luther Stalland
1,250 Less: Child Support (Jan.-Oct.)
(7,500)
Less: Child Support (Nov.-Dec.)
(1,200)
Unknown Difference
(25)
Alimony Deducted on 1975 Return
$ 7,600 Agent Brandenburg determined that the $ 7,600 deducted as alimony was overstated. First, the $ 2,954 paid to Twin City Federal included interest payments of $ 966.32 and tax payments of $ 1,412.84 which were already deducted by petitioners on Schedule A of their 1975 return. Second, he determined that alimony was overstated by $ 262.42, which consisted of petitioner's portion of principal paid to Twin City Federal of $ 287.42, less $ 25 which was unaccounted for. He thus determined that alimony was overstated by a total of $ 2,641.58. 4. Lil' Andy's, Inc.
In 1969, petitioner Harry N. Ray acquired all of the stock of Lil' Andy's, Inc., a restaurant which was located in Minneapolis, Minnesota. Lil' Andy's was operated by petitioner, *138 Iona Ray, and their children for several years. Petitioner handled all of the records of the business. Joyce Ray knew nothing about the operation of Lil' Andy's. Petitioner lent money to Lil' Andy's. Petitioner deducted as a bad debt the amounts he lent to Lil' Andy's under sections 166 and 1222. 5. Fun Machines, Inc.
In April 1979 petitioner purchased all of the outstanding stock (600 shares) of Fun Machines, Inc., a Wisconsin subchapter S corporation, for $ 92,000. A $ 10,000 downpayment was made by a check written on the Trust Account of Harry Ray, Ltd. In 1979, petitioner made four payments totaling $ 27,500 to Fun Machines from the trust account of Harry Ray, Ltd. Trust accounts were established by petitioner to hold funds of clients for some specified purpose. The payments were designated as "investment" or "loans." On February 26, 1980, the trust account of Harry Ray, Ltd., made a payment to Fun Machines of $ 2,500. On April 21, 1980, petitioner as president of Fun Machines, executed a demand note for $ 16,000 from Fun Machines to the Ruth T. Benke Trust. The Ruth T. Benke Trust was one of petitioner's clients. On March 25, 1981, petitioner executed a Small *139 Business Administration Guaranty of $ 360,000 relating to a loan made to Fun Machines by First National Bank of Minneapolis. On July 1, 1981, petitioner sold 300 shares of stock in Fun Machines to John Beckman (hereafter Beckman). Beckman gave petitioner a promissory note for $ 124,000 for the stock. The promissory note stated that Beckman would pay petitioner $ 2,000 per month, plus interest at an annual rate of 12 percent at the time of each installment. Beckman became president of Fun Machines upon acquiring 50 percent of its common stock in 1981. Petitioner had a zero basis in the shares of stock sold to Beckman. Petitioner sold stock in Fun Machines in 1981. However, in determining his loss from Fun Machines, petitioner did not reduce his basis in Fun Machines by the sales price of the stock he sold in 1981. On their 1979, 1980, and 1981 returns, petitioners claimed losses from Fun Machines of $ 9,022, $ 15,745, and $ 56,537, respectively. Petitioners did not report any gain from the sale of stock in Fun Machines on their returns for 1981 through 1984. Instead, in 1982, 1983, and 1984, petitioners claimed losses from Fun Machines in the amounts of $ 78,851, $ 44,379, *140 and $ 45,549, respectively. Part of petitioner's claimed basis in Fun Machines is attributable to amounts that were held by him as client trust funds in his law practice and subsequently transferred to Fun Machines. By order dated June 14, 1985, the Supreme Court of the State of Minnesota suspended petitioner from the practice of law in the State of Minnesota for three years based on his handling of client trust funds and other matters. Under the purchase agreement, petitioner and Beckman personally guaranteed the obligations of Fun Machines, i.e., the $ 338,000 balance due under the agreement. On October 27, 1981, Fun Machines entered into an Article of Agreement to purchase Ackley Novelty for $ 428,000 from Robert Birkenmeier. No Federal income tax returns were filed for Fun Machines for the years 1982, 1983, or 1984. 6. Harry N. Ray, Ltd.
On May 1, 1975, petitioner incorporated his law practice as Harry N. Ray, Ltd., a subchapter S corporation of which petitioner was the sole shareholder. Upon the incorporation of Harry Ray, Ltd., petitioner executed a bill of sale to Harry Ray, Ltd., with listed items totaling $ 100,417.41. Petitioner prepared the corporate returns *141 for Harry Ray, Ltd., for fiscal years 1976, 1977, 1978, 1979, 1980, 1981, 1982, and 1984. For the fiscal year ending April 30, 1985, the return for Harry Ray, Ltd., was signed by John F. Markert as president. No name appeared as preparer. During the years 1979, 1982, 1983, and 1984, petitioner conducted his law practice as an employee of Harry Ray, Ltd. Joyce was also employed by Harry Ray, Ltd. Petitioners deducted losses from Harry Ray, Ltd., of $ 15,877.92, $ 11,827.84, $ 4,908, and $ 9,993, respectively, on their 1976, 1977, 1982, and 1984 returns. Petitioner's computation of his basis in Harry Ray, Ltd., totaled $ 199,245.15 and included the total from the bill of sale, as well as cash donations in 1978, 1979, 1981, and 1983. His computation included no withdrawals or allowances for losses. Prior to incorporating Harry Ray, Ltd., petitioner and Joyce were cash basis taxpayers. Petitioner reported his law practice earnings on a Schedule C and had no basis in accounts receivable from his law practice. On the return filed by petitioners prior to incorporation of Harry Ray, Ltd., supplies for the law practice were expensed. There was no basis in the supplies inventory *142 listed on the bill of sale to Harry Ray, Ltd. Work in progress transferred from petitioner's law practice to Harry Ray, Ltd., had no basis because he was a cash basis taxpayer prior to incorporation of Harry Ray, Ltd. Petitioner had a zero basis in Harry Ray, Ltd., for the fiscal years ended April 30, 1976, 1977, 1978, 1979, 1980, and 1985. After accounting for Harry Ray, Ltd.'s loss in April 1981, basis at year end (April 30, 1981) was $ 12,099.34. Petitioner had a basis of $ 12,891.56, $ 10,110.60, and $ 117.23 in Harry Ray, Ltd., for fiscal years 1982, 1983, and 1984, respectively. Due to withdrawals from April 1984 through April 1985, petitioner's basis in Harry Ray, Ltd., as of the end of April 1985 was zero. 7. Interest Income
Beckman made payments to petitioner from August 1981 through June 1984, totaling $ 88,000. Petitioners reported $ 4,500 and $ 6,000 in interest income from Beckman on their 1983 and 1984 returns, respectively. They reported no interest income from Beckman on their 1982 return. In 1985 petitioner submitted to the IRS, on behalf of Beckman, a schedule showing a detailed breakdown of principal and interest paid by Beckman on the Fun Machines *143 note. Interest payments totaling $ 7,044.04, $ 6,000, and $ 16,162.56 were made by Beckman in 1982, 1983, and during the first six months of 1984, respectively. 8. Capital Gains on the Sale of Fun Machines Stock
Petitioner reported a capital loss carryforward of $ 3,000 for 1982, and a capital gain of $ 4,981 for 1984. Petitioner reported no gain from the sale of Fun Machines stock on his returns for 1981 through 1984, despite his sale to Beckman on an installment basis in 1981. Petitioner received principal payments from Beckman totaling $ 5,726, $ 16,956, and $ 6,837 in 1981, 1982, and during the first six months of 1984, respectively. 9. Investment Tax Credit
Petitioners claimed investment tax credits of $ 9,719, $ 3,247, and $ 10,720 on their returns for 1982, 1983, and 1984, respectively. The investment tax credit of $ 10,720 claimed in 1984 included a carryforward of investment tax credit from 1983 in the amount of $ 3,247. That amount ($ 3,247) was claimed on the 1983 return. Petitioners claimed investment tax credits for the following property of Fun Machines in 1983: Unadjusted
Applicable
Qualified
Life
Basis   Percentage
Investment
New Property
3-year
$ 7,954 40%
$ 3,182 New Property
Other
29,798
80%
23,838
Used Property
Other
6,818
80%
5,454
Total     $ 32,474
*144 There is no credible evidence in the record from which a determination can be made as to whether the equipment was new or used, or when it was placed in service. 10. Home Office Deduction
Joyce worked full-time in petitioner's law offices until the birth of their first child in October 1976. Thereafter, she worked mainly in their home, where she had a typewriter, word processing equipment, and a transcriber to type dictation from the law office. Since the birth of their son, all of her work has been done at home, except when she occasionally visited petitioner's law office. Petitioners claimed certain expenses for a home office on their 1975 return which were not disallowed by respondent. Petitioners did not claim a home office deduction on their 1976, 1977, and 1979 returns; however, they raised this issue by amended petition. 11. Innocent Spouse
Joyce Ray was previously married, and divorced in October 1964. Joyce Ray's first marriage was a financial disaster. Her first husband was a spendthrift who used her savings. As a result of her first marriage, Joyce Ray has never owned anything jointly with petitioner, including bank accounts. She has consistently *145 maintained her own savings and checking accounts in which she deposited her earnings. She wanted to keep her financial records separate from petitioner's and control her own money. Joyce Ray was not the bookkeeper for petitioner's law practice. Joyce Ray did not otherwise do the banking for petitioner's professional corporation or petitioner individually. However, she typed client billing statements, and filled out an occasional bank deposit slip for petitioner. Petitioner controlled the financial aspects of his business and he kept his financial records in a locked cabinet. He also controlled the incoming mail. Petitioner prepared petitioners' 1975, 1976, 1977, 1978, 1979, 1982, 1983 and 1984 returns. Joyce Ray made computations, reviewed records, and compiled information necessary for the preparation of their returns. In reporting installment proceeds on the 1975 through 1979 returns, Joyce Ray made mathematical computations based on information provided by petitioner or obtained from his records and then gave these figures to him for review. For example, Joyce Ray made the computations to determine what part of the proceeds from the sale of six properties sold on the *146 installment basis in 1978 would be taxable in that year. In determining rental income for the 1978 return, Joyce Ray totaled the amounts received from the rental property, and asked petitioner questions if she had any. The expenses relating to the rental income schedule for 1978 were from the check register or canceled checks. Petitioners considered them deductible if they were written as an expense for the building. Petitioner did not tell Joyce Ray which checks were deductible. Joyce Ray computed the alimony deductions of $ 7,200 on the 1978 return by taking $ 600 a month times 12, which was the amount petitioner paid Iona Ray. She referred to canceled checks written to Iona Ray each month. Joyce Ray decided to send a copy of the divorce decree from the office divorce file to Agent Mary Lou Oreschnick rather than a certified copy as Agent Oreschnick had requested. She typed a letter dated October 15, 1980, and forwarded the copy to Agent Oreschnick. Joyce Ray computed the alimony deduction for 1975 through 1979. Joyce stated that she believed that these payments were properly viewed as alimony even though the divorce decree provided that no alimony would be paid, because *147 IRS Publication No. 17 provided that periodic payments in property settlements were to be treated as alimony regardless of how State courts characterize the payments. OPINION Unless otherwise noted, petitioners bear the burden of proof. Rule 142(a). 1. Alimony Payments
The first issue for decision is whether payments to Iona Ray in 1975, 1976, 1977, and 1979 were deductible as alimony, or were payments for a property settlement between Iona Ray and petitioner. Under section 215, [4] amounts paid as alimony or separate maintenance are deductible if those payments are includable in the recipient's gross income under section 71. Yoakum v. Commissioner, 82 T.C. 128, 134 (1984). *148 Section 71(a) [5] provides that the wife must include in her gross income periodic payments received in discharge of a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under a divorce decree. Section 71(a) applies to payments made in recognition of the general obligation to support which is made specific by the decree. Yoakum v. Commissioner, supra.Payments which are part of a property settlement are capital in nature and are not subject to section 71. Yoakum v. Commissioner, supra; Thompson v. Commissioner, 50 T.C. 522, 525 (1968); Price v. Commissioner, 49 T.C. 676 (1968); see Wickworth v. Commissioner, T.C. Memo 1978-14. *149 Here, petitioner's payments to Iona Ray were made pursuant to the divorce decree. Accordingly, the question is whether the payments were periodic and in the nature of alimony or separate maintenance, or were payments which are part of a property settlement. Petitioner claims that he made the payments to Iona Ray in discharge of a legal obligation arising out of their marital relationship and that they constitute alimony. Respondent argues that the payments were made by petitioner as part of a property settlement negotiated with Iona Ray and that paragraph 10 of the judgment and decree states that Iona Ray was awarded no alimony and waived her rights to any past, present, or future alimony. In resolving the character of an award as support or property in a divorce or separation decree, great weight is given to the language and structure of the decree. Griffith v. Commissioner, 749 F.2d 11, 13 (6th Cir. 1984), affg. T.C. Memo 1983-278. The determination of whether payments are in the nature of support or part of a property settlement, however, is not controlled by the labels assigned to the payments by the court in the divorce decree or by *150 the parties in their agreement. Beard v. Commissioner, 77 T.C. 1275, 1283-1284 (1981); Hesse v. Commissioner, 60 T.C. 685, 691 (1973), affd. without published opinion 511 F.2d 1393 (3d Cir. 1975). Rather, the determination rests upon all of the surrounding facts and circumstances. Yoakum v. Commissioner, supra at 140; Beard v. Commissioner, supra at 1284; Gammill v. Commissioner, 73 T.C. 921, 926-927 (1980), affd. 710 F.2d 607 (10th Cir. 1982); Widmer v. Commissioner, 75 T.C. 405, 409 (1980); Mirsky v. Commissioner, 56 T.C. 664, 675 (1971). In Beard v. Commissioner, supra at 1284-1285, we delineated factors which indicate that payments are more like a property settlement than a support allowance as follows: (1) That the parties in their agreement (or the court in its decree) intended the payments to effect a division of their assets, Porter v. Commissioner, 388 F.2d 670, 671 (6th Cir. 1968), affg. per curiam a Memorandum Opinion of this Court; Wright *151 v. Commissioner[, 62 T.C. 377, 389 (1974), affd. 543 F.2d 593 (7th Cir. 1976)]; (2) that the recipient surrendered valuable property rights in exchange for the payments, Mann v. Commissioner, 74 T.C. 1249, 1249-1262 (1980); Gammill v. Commissioner, 73 T.C. 921, 928-929 (1980), [affd. 710 F.2d 607 (10th Cir, 1982)]; Warnack v. Commissioner[, 71 T.C. 541, 550-551 (1979)]; (3) that the payments are fixed in amount and not subject to contingencies, such as the death or remarriage of the recipient, Widmer v. Commissioner, 75 T.C. 405, 409 (1980), on appeal (7th Cir., June 26, 1981); McCombs v. Commissioner, 397 F.2d 4, 7 (10th Cir. 1968), affg. a Memorandum Opinion of this Court; Land v. Commissioner, 61 T.C. 675, 683 (1974); (4) that the payments are secured, Widmer v. Commissioner, supra; Gammill v. Commissioner, supra at 929; (5) that the amount of the payments plus the other property awarded to the recipient equals approximately one-half of the property accumulated by *152 the parties during marriage, Lambros v. Commissioner, 459 F.2d 69, 71-72 (6th Cir. 1972), affg. a Memorandum Opinion of this Court; Schottenstein v. Commissioner, 75 T.C. 451, 464 (1980); (6) that the need of the recipient was not taken into consideration in determining the amount of the payments, McCombs v. Commissioner, supra; and (7) that a separate provision for support was provided elsewhere in the decree or agreement. Schottenstein v. Commissioner, supra at 457. Conversely, the absence of one or more of the above factors may tend to indicate that the payments are more in the nature of a support allowance.
We begin our analysis with an examination of the Minnesota statute governing the division of property. We note that while State law defines property rights, Federal law determines the tax consequences of these rights. Sampson v. Commissioner, 81 T.C. 614, 618 (1983), affd. without published opinion 829 F.2d 39 (6th Cir. 1987). The pertinent Minnesota statutory provision in effect during the years in issue ( Minn. Stat. Ann. sec. 518.55, subd. 1 *153 (West 1974)) provided as follows: Every award of alimony or support money in a judgment of dissolution shall clearly designate whether the same is alimony or support money, or what part of the award is alimony and what part thereof is support money. Any award of payments from future income or earnings of the custodial parent shall be presumed to be alimony. Any award of payments from the future income or earnings of the non-custodial parent shall be presumed to be support money unless otherwise designated by the court. In any judgment of dissolution the court may determine, as one of the issues of the case, whether or not either spouse is entitled to an award of alimony notwithstanding that no award is then made, or it may reserve jurisdiction of the issue of alimony for determination at a later date.
Minnesota law in effect during the relevant years ( Minn. Stat. Ann. sec. 518.58 (West 1974)) provides the following guidelines on the division of marital property: Upon a dissolution of a marriage, or upon an annulment, the court may make such disposition of the property of the parties acquired during coverture as shall appear just and equitable, having regard to the nature *154 and determination of the issues in the case, the amount of alimony or support money, if any, awarded in the judgment, the manner by which said property was acquired and the persons paying or supplying the consideration therefor, * * * and all the facts and circumstances of the case.
Taking into account the decree, the relevant provisions of Minnesota law, and the facts concerning the parties' intentions during the drafting of the decree, we conclude that the parties intended to make a division of their assets with the payments. The decree states that Iona Ray was awarded no alimony and waived her rights to all past, present, and future alimony. The failure to agree to alimony for Iona Ray is consistent with petitioner's antipathy toward alimony as evidenced by correspondence with McCullough before and during the drafting of the divorce decree. Further indication that the monthly payments were not intended as alimony is that Iona Ray and her attorney believed that the payments were not taxable to her. Indeed, Iona Ray's attorney filed her returns for her and did not include the payments in income. Iona Ray surrendered valuable property rights in exchange for the payments. *155 As a "settlement in lieu of" her interest in the real estate she owned jointly with petitioner, she quitclaimed all of her interest in the four properties. The payments were secured by a provision that required net proceeds after taxes, encumbrances, and costs of sale to be placed in an interest-bearing investment for Iona Ray's life. The monthly installment payments were an alternative to a lump-sum payment, equaling 50 percent of the value of the marital property transferred by Iona Ray to petitioner. We note that although there is no provision in the decree for payments after Iona Ray's death, upon her remarriage the monthly payments were to be replaced by a lump-sum payment of one-half of the net proceeds (minus any amounts already paid) from the sale of the properties in which Iona Ray relinquished her interest pursuant to the divorce decree. This shows that the payments were intended as part of a property settlement. In addition, the amount of the payments was a fixed sum, and was not based on petitioner's income. Yoakum v. Commissioner, supra at 140; Riley v. Commissioner, 649 F.2d 768, 772 (10th Cir. 1981), affg. T.C. Memo 1979-237. *156 Petitioner's obligation to pay Iona Ray $ 600 per month was to remain in effect despite changes in either petitioner's or Iona Ray's income. Although paragraph 6 of the decree somewhat ambiguously refers to payments for support of Iona Ray and the children, and paragraph 15 describes the maximum amount Iona Ray would receive for "support" while occupying the homestead, we do not find this language to be fatal to our conclusion that the payments were not alimony or maintenance. Rather, we conclude that references to "support" should be interpreted as child support or property settlement payments. We conclude that the payments to Iona Ray were part of a property settlement between petitioner and Iona Ray and were not alimony. 2. Lil' Andy's and Short-term Capital Loss Carryforward
In 1977, petitioners deducted as a short-term capital loss carryforward amounts allegedly owed to them for loans made by petitioner to Lil' Andy's, Inc. Petitioners claim entitlement to a short-term loss on the basis that the debt was a nonbusiness bad debt within the meaning of section 166(d)(2). Section 166(a) provides a deduction for any debt which becomes worthless during the taxable year. *157 For noncorporate taxpayers, a nonbusiness bad debt is treated as a short-term capital loss. Only a bona fide debt qualifies for purposes of section 166; Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1338-1339 (1971), affd. per curiam without published opinion 496 F.2d 876 (5th Cir. 1974); sec. 1.166-1(c), Income Tax Regs. A bona fide debt is a debt which arises from a debtor/creditor relationship based upon a valid and enforceable obligation to repay a fixed or determinable sum of money. Sec. 1.166-1(c), Income Tax Regs. A gift or contribution to capital is not considered a debt for purposes of section 166. Sec. 1.166-1(c), Income Tax Regs; In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976). To qualify for a deduction for a nonbusiness bad debt under section 166(d)(1), petitioner must show that the debt has become totally worthless. Pierson v. Commissioner, 27 T.C. 330, 338 (1956), affd. 253 F.2d 928 (3d Cir. 1958). Moreover, petitioner must show that the nonbusiness bad debt became wholly worthless within the taxable year in which the deduction is claimed. Pierson v. Commissioner, supra; *158 section 1.166-5(a)(2), Income Tax Regs.
Whether and when a debt becomes worthless is determined on the basis of all the facts and circumstances including the value of the collateral, if any, securing the debt and the financial condition of the debtor. Sec. 1.166-2(a), Income Tax Regs.; Eagle v. Commissioner, 242 F.2d 635, 637 (5th Cir. 1957), revg. and remanding 25 T.C. 169 (1955); Lunsford v. Commissioner, 212 F.2d 878, 883 (5th Cir. 1954), affg. in part a Memorandum Opinion of this Court dated May 29, 1952; Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). A debt is considered worthless only when there is no reasonable possibility of future payment. Hawkins v. Commissioner, 20 T.C. 1069, 1074 (1953). The record with respect to this issue is extremely meager. Petitioners have offered no evidence showing when the debt became worthless, or even that it did become worthless. An examination of the facts reveals that there was complete identity of interest between the parties, and there was no fixed date for payment of the notes or a reasonable expectation of payment on the notes. *159 In re Uneco, Inc., supra at 1210; see Astleford v. Commissioner, T.C. Memo 1974-184, affd. 516 F.2d 1394 (8th Cir. 1975). Moreover, petitioner did not require any security or other guarantees for repayment of the loan. These factors suggest the absence of intent to create a bona fide debt. In re Uneco, Inc., supra.
Petitioner has not shown that the debt was bona fide, or, if bona fide, in what year it became worthless. Accordingly, a bad debt deduction under section 166(a) will not be allowed for 1977. 3. Fun Machines, Inc.
Petitioners deducted losses from Fun Machines in 1982, 1983, and 1984. Fun Machines was a subchapter S corporation during these years. Under section 1366(d)(1), a shareholder's deduction of his portion of the losses from a subchapter S corporation is limited to the sum of (1) his adjusted basis in stock in the corporation, and (2) his adjusted basis in any debt owed by the corporation to the shareholder. Petitioners must establish that Fun Machines sustained losses in the relevant years, and that petitioners had sufficient basis in Fun Machines in each of those years to deduct losses therefrom. *160 Under sections 167(g), 1011, and 1012, the cost basis of property for depreciation purposes is determined by the cost of the property, and a taxpayer's cost generally includes valid indebtedness incurred in acquiring the property. Sec. 1.1012-1, Income Tax Regs.; Crane v. Commissioner, 331 U.S. 1, 91 L. Ed. 1301, 67 S. Ct. 1047 (1947); Waddell v. Commissioner, 86 T.C. 848, 898 (1986), affd. 841 F.2d 264 (9th Cir. 1988); Blackstone Theatre Co. v. Commissioner, 12 T.C. 801, 804 (1949). Indebtedness, however, which is not genuine and which does not represent a fixed and definite obligation to pay does not add to a taxpayer's basis. Waddell v. Commissioner, supra.See also Estate of Franklin v. Commissioner, 544 F.2d 1045, 1047-1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); Denver & Rio Grande Western R.R. Co. v. United States, 205 Ct. Cl. 597, 505 F.2d 1266, 1270-1271 (1974); Graf v. Commissioner, 80 T.C. 944, 947 (1983). In analyzing the genuineness of indebtedness, the substance of the transaction controls, not its form. *161 Commissioner v. Tower, 327 U.S. 280, 291-292, 90 L. Ed. 670, 66 S. Ct. 532 (1946); Gregory v. Helvering, 293 U.S. 465, 469, 79 L. Ed. 596, 55 S. Ct. 266 (1935). Factors that are considered in analyzing whether indebtedness is genuine are: (1) Whether the creditor investigated the financial status and credit worthiness of the debtor, Capek v. Commissioner, 86 T.C. 14, 48-49 (1986); (2) the debtor's ability to make payments on the indebtedness, Burns v. Commissioner, 78 T.C. 185, 212 (1982); (3) the likelihood of repayment of the indebtedness by the debtor, Packard v. Commissioner, 85 T.C. 397, 428 (1985); (4) compliance with regulatory requirements governing the transaction, Frank Lyon Co. v. United States, 435 U.S. 561, 55 L. Ed. 2d 550, 98 S. Ct. 1291 (1978); (5) the presence of arm's-length negotiations between the debtor and creditor, Frank Lyon Co. v. United States, supra at 582; and (6) the sufficiency of the debtor's assets to satisfy the indebtedness in the event the investment for which the loan funds were to be applied is not successful, Frank Lyon Co. v. United States, supra; McAlister v. Commissioner, T.C. Memo 1989-177, *162 affd. without published opinion 923 F.2d 862 (9th Cir. 1991). There is no evidence in the record as to whether Fun Machines sustained losses in 1982, 1983, and 1984 and, if so, in what amount. No Federal income tax returns were filed by Fun Machines for those years. Petitioner stipulated that when he sold half the stock in Fun Machines to Beckman on July 1, 1981, he had a zero basis in those shares of stock. However, he submitted no evidence to establish that he increased his basis from July 1981. Petitioners deducted losses every year they were involved with Fun Machines. In 1979, although the $ 9,022 loss was the smallest claimed by petitioner, it was sufficient to cause Joyce to request verification from the corporation's accountant, Harry Peterson, that the K-1 he had supplied for 1979 was correct. Petitioner submitted evidence of transfers from Harry Ray, Ltd., to Fun Machines ostensibly to prove basis. These transfers were from the trust account of Harry Ray, Ltd., rather than from its general account or from a personal account of Harry Ray. Petitioner offered no evidence indicating that the funds in the trust account belonged either to petitioners or *163 to Harry Ray, Ltd., rather than to clients of Harry Ray, Ltd. As evidenced by his suspension from the Minnesota bar for his mishandling of client trust accounts, petitioner did not have authority to invest his client's funds in Fun Machines. Thus, petitioner cannot claim basis in Fun Machines attributable to client trust accounts. Petitioner argues that his personal guarantee on loans to Fun Machines increased his basis, citing Selfe v. United States, 778 F.2d 769 (11th Cir. 1985); Plantation Patterns Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), affg. T.C. Memo 1970-182; and Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), affd. 875 F.2d 420 (4th Cir. 1989). In Selfe v. United States, supra, the Eleventh Circuit applied a debt-equity analysis and held that a shareholder's guarantee of a loan to a subchapter S corporation may be treated for tax purposes as an equity investment in the corporation where the lender looks to the shareholder as the primary obligor. In Estate of Leavitt v. Commissioner, supra, we rejected the Eleventh *164 Circuit's reasoning in Selfe, and held that shareholder guarantees of a loan to a subchapter S corporation do not increase shareholders' stock basis absent an economic outlay by the shareholders. 90 T.C. at 212-213, 216. We recognized that the Selfe opinion relied primarily on Plantation Patterns, Inc. v. Commissioner, in which the Fifth Circuit affirmed our finding that a shareholder's guarantee of a third party loan to a corporation was in substance a loan to the shareholder followed by his contribution of the loan proceeds to the corporation. However, we noted that the corporation in Plantation Patterns was a subchapter C corporation, and declined to apply the debt-equity analysis to loan guarantees to subchapter S corporations for which the shareholder has incurred no cost. 90 T.C. at 216-218. We find that the instant case is controlled by Estate of Leavitt, and that petitioner's basis in Fun Machines is not increased by his guarantee of loans to the corporation. See Harris v. United States, 902 F.2d 439, 442-443 (5th Cir. 1990); Russell v. Commissioner, T.C. Memo 1990-217; Suisman v. Commissioner, T.C. Memo 1989-629; *165 Roesch v. Commissioner, T.C. Memo 1989-158, affd. without published opinion 911 F.2d 724 (4th Cir. 1990). Petitioner has failed to establish that he had an adjusted basis in stock and debt in Fun Machines sufficient to allow him to deduct the losses claimed on the 1982, 1983, and 1984 returns. Accordingly, respondent's disallowance of losses from Fun Machines in 1982, 1983, and 1984 is sustained. 4. Harry Ray, Ltd.
Petitioners deducted losses from Harry Ray, Ltd., in 1976, 1977, 1982, and 1984. Harry Ray, Ltd., was a subchapter S corporation during each of those years. To deduct such losses, it must be established that Harry Ray, Ltd., sustained losses in those years, and that petitioners had sufficient basis in Harry Ray, Ltd., in each of those years to deduct losses therefrom. Respondent raised this issue in amended pleadings, and therefore bears the burden of proof. Rule 142(a); see Papineau v. Commissioner, 28 T.C. 54, 57 (1957). Respondent conceded that petitioner had sufficient basis in Harry Ray, Ltd., at the end of April 1982 and April 1984 to deduct his losses for those years. Respondent established, *166 however, that petitioner had a zero basis in Harry Ray, Ltd., for 1976 and 1977, and therefore cannot deduct any losses attributable thereto in those years. Under section 1366(d)(1), a shareholder's deduction of his portion of the losses from a subchapter S corporation is limited to the sum of (1) his basis in stock in the corporation, and (2) his basis in any debt owed by the corporation to the shareholder. We have found that petitioner had a zero basis in Harry Ray, Ltd., for 1976 and 1977. Accordingly, petitioner is not entitled to deduct losses from Harry Ray, Ltd., in those years. 5. Interest Income
Under section 61(a), gross income includes interest income. Thus, all interest payments from John Beckman should have been included in petitioners' income in 1982, 1983, and 1984. In preparation for the trial in this case, petitioners submitted to respondent a breakdown of principal and interest payments received from Beckman for 1982, 1983, and 1984. It showed that they had significantly underreported interest on their returns. Petitioner argues that he applied the payments received in 1981 and 1982 entirely to principal at Beckman's request. Petitioner contends *167 that parties can agree to allocate loan payments to principal rather than to principal and interest, and that respondent has no authority to ignore an agreement to that effect. Finally, petitioner maintains that although the Beckman payments were allocated solely to principal, the terms of the note were met because interest was still due and owing as provided in the note. We find petitioner's arguments to be wholly without merit. He ignores the fact that the promissory note stated that Beckman would pay petitioner $ 2,000 per month, plus the full amount of interest due on the note at the time of each installment, at an annual rate of 12 percent. In addition, petitioner reported some interest on his 1983 and 1984 returns, thus acknowledging that the claimed allocation to principal of all payments received from Beckman was incorrect. Accordingly, we sustain respondent's determination that petitioner failed to report interest income from John Beckman in the amounts of $ 7,044, $ 1,500, and $ 12,663 for 1982, 1983, and 1984, respectively. 6. Capital Gains on the Sale of Fun Machines Stock
Petitioner reported a capital loss carryforward in 1982 and a small capital gain in *168 1984. However, notwithstanding his sale of Fun Machines stock on an installment basis in 1981, he reported no gain from the sale of Fun Machines stock in either year. Petitioner conceded that he had a zero basis in the Fun Machines stock he sold to Beckman. Accordingly, he realized gain to the extent he received principal payments from Beckman for the stock. We hold that petitioner had capital gains of $ 5,726 and $ 6,837 in 1982 and 1984, respectively. Because there is no evidence in the record to indicate that petitioner had other capital gains in those years, we sustain respondent's determination only to the extent of these amounts. 7. Investment Tax Credit
An investment tax credit is allowed in the year in which qualifying property is placed in service by the taxpayer. Secs. 38(a), 46(a)(1) and (2), 46(c)(1). The investment tax credit is limited to property which is depreciable and has a useful life of three years or more. Sec. 48(a)(1). To be eligible for an investment tax credit, property must be used in a trade or business. Secs. 48(a)(1), 168(c). Petitioners must also establish their basis in the property and whether the property was new or used. Secs. *169 46(c), 48(b), 48(c), and 168. Petitioners failed to introduce sufficient evidence to prove their basis in the investment tax credit property, when it was placed in service, or whether it was new or used. Accordingly, we sustain respondent's disallowance of petitioners' investment tax credits in 1982, 1983, and 1984 because they failed to establish that the property qualified for an investment tax credit. 8. Home Office Deduction
Petitioners claim entitlement to home office deductions for 1976, 1977, and 1979. Section 280A provides, in pertinent part: SEC. 280A. DISALLOWANCE OF CERTAIN EXPENSES IN CONNECTION WITH BUSINESS USE OF HOME, RENTAL OF VACATION HOMES, ETC. (a) GENERAL RULE. -- Except as otherwise provided in this section, in the case of a taxpayer who is an individual or an electing small business corporation, no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence.
* * * (c) EXCEPTIONS FOR CERTAIN BUSINESS OR RENTAL USE; LIMITATION ON DEDUCTIONS FOR SUCH USE. -- (1) CERTAIN BUSINESS USE. -- Subsection (a) shall not *170 apply to any item to the extent such item is allocable to a portion of the dwelling unit which is exclusively used on a regular basis -- (A) [as] the principal place of business for any trade or business of the taxpayer, (B) as a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his trade or business, or * * * In the case of an employee, the preceding sentence shall apply only if the exclusive use referred to in the preceding sentence is for the convenience of his employer.
Section 280A(c)(1)(A) allows a deduction for home office expenses if the home office is exclusively and regularly used as the principal place of any trade or business. Section 280A(c)(1)(B) allows a deduction for home office expenses if the home office is exclusively and regularly used as a place of business used by clients, patients, or customers to meet with the taxpayer in the normal course of his trade or business. Petitioners have not established that any part of their home was used either as the principal place of business for a trade or business, or a place of business used by patients, clients, or customers meeting *171 or dealing with the taxpayer in the normal course of his trade or business as required by section 280A(c). In addition, petitioners did not substantiate expenses associated with the claimed home office. We conclude that petitioners are not entitled to home office deductions for 1976, 1977, and 1979. 9. Innocent Spouse Relief
Petitioners contend that Joyce Ray is entitled to relief under section 6013(e) as an innocent spouse. To obtain relief under section 6013(e), the person asserting innocent spouse status must prove that: (1) Joint returns were made for each year in issue; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse on each return; (3) the spouse desiring relief did not know, and had no reason to know, of such substantial understatement when signing the return; and (4) taking into account all facts and circumstances, it is inequitable to hold the spouse seeking relief liable for the deficiency attributable to such substantial understatement. Sec. 6013(e)(1). A taxpayer must prove compliance with each of these provisions to qualify as an innocent spouse. Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), *172 affg. 86 T.C. 228 (1986). a. Joint Return
Respondent concedes that Joyce Ray and petitioner filed a joint return for the years in issue. However, respondent argues that Joyce has failed to establish that the substantial understatement of tax was due to petitioner's grossly erroneous items, that she did not know and had no reason to know of the understatement, and that it would be inequitable to hold her liable for the tax. b. Substantial Understatement of Grossly Erroneous Items Attributable to the Other Spouse Grossly erroneous items are any item of gross income omitted from gross income, and any claim of a deduction, credit, or basis in an amount for which there is no basis in fact or law. Sec. 6013(e)(2)(A) and (B). Grossly erroneous items under section 6013(e)(2)(B) have been equated to deductions that are fraudulent, frivolous, phony, or groundless. Stevens v. Commissioner, 872 F.2d 1499, 1504 n.6 (11th Cir. 1989(, affg. T.C. Memo 1988-63; Purcell v. Commissioner, supra at 475; Bokum v. Commissioner, T.C. Memo 1990-21. Respondent contends that Joyce has failed *173 to satisfy the requirement that the grossly erroneous items be attributable to petitioner. Respondent argues instead that the grossly erroneous items were items of both petitioners. For example, the largest single adjustment for 1975, 1976, 1977, and 1979 is the disallowance of the alimony deduction. Respondent claims that this item is not solely attributable to petitioner because Joyce helped petitioner determine whether the payments to Iona Ray were alimony or a property settlement and the amount of the alimony deduction for those years. For reasons apparent in the following section, we need not decide whether Joyce Ray meets the requirement of section 6013(e)(1)(B). c. Knowledge or Reason to Know of Substantial Understatement
Under section 6013(e)(1)(C), the taxpayer must establish that in signing the return she did not know, and had no reason to know, of the substantial understatement. The test to determine whether the taxpayer had reason to know of the substantial understatement is whether, at the time of signing the returns, a reasonable person in the taxpayer's circumstances (i.e., intelligence, emotional state, level of involvement in the financial transactions *174 giving rise to the income, complexity of such transactions, lavish or unusual expenditures, etc.) could have been expected to know of the substantial understatement (or that the tax liability stated was erroneous) or that further investigation was warranted. Stevens v. Commissioner, supra at 1505; Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. on this issue T.C. Memo 1984-310; Sanders v. United States, 509 F.2d 162, 166-168 (5th Cir. 1975); Tharp v. Commissioner, T.C. Memo 1989-406; Malandro v. Commissioner, T.C. Memo 1989-135. A spouse may not close his or her eyes to unusual or lavish expenditures which might have alerted him or her to unreported income, Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979); Mysse v. Commissioner, 57 T.C. 680, 699 (1972), because section 6013(e) is designed to protect the innocent, not the intentionally ignorant. Hayes v. Commissioner, T.C. Memo 1989-327. The alleged innocent spouse's participation in business affairs or bookkeeping ( Quinn v. Commissioner, 62 T.C. 223 (1974), *175 affd. 524 F.2d 617 (7th Cir. 1975)) is a significant factor in determining whether a spouse had reason to know of a substantial understatement of tax. In order to satisfy her burden of proof with regard to whether she had reason to know of the omitted income, Joyce Ray must establish that a reasonably prudent taxpayer, with her knowledge of the family finances, would have no reason to know of the omission. Sanders v. United States, supra at 166-167; Estate of Jackson v. Commissioner, 72 T.C. 356, 361 (1979). With respect to this element, the only direct evidence of Joyce's lack of knowledge of the omission of income, the improper taking of alimony deductions, etc., is her self-serving testimony to that effect. While Joyce Ray would have us believe that she was totally unsophisticated in tax matters, the weight of the evidence is to the contrary. She had a passing familiarity with her husband's law practice and other business ventures and the joint returns. See McCoy v. Commissioner, 57 T.C. 732, 734 (1972). In addition, Joyce testified that she became aware of petitioner's involvement in Fun Machines *176 in 1979, the first year that they filed a joint return after he bought the Fun Machines stock. Although she had limited business knowledge of Fun Machines, she contacted Harry Peterson, Fun Machines' accountant, when she saw the K-1 for Fun Machines for 1979 showing a loss, and asked whether everything on the K-1 was correct. We find that it is unlikely that a wife who worked for her husband for many years and helped prepare the joint tax returns was as unaware as she made it appear. We are not convinced that she had no knowledge or reason to know of the omission of interest income or that the alimony deduction was improper. d. Inequitable to Hold Spouse Liable for Tax
Having found that Joyce Ray did not satisfy section 6013(e)(1)(C), we do not need to reach section 6013(e)(1)(D). 10. Fraud
The existence of fraud is a question of fact to be determined from the entire record. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988); Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980); Stratton v. Commissioner, 54 T.C. 255, 284 (1970). Respondent has the burden of proving fraud by clear and convincing evidence. *177 Sec. 7454(a); Rule 142(b); Castillo v. Commissioner, 84 T.C. 405, 408 (1985); Stone v. Commissioner, 56 T.C. 213, 220 (1971). Respondent must establish (1) that petitioner has underpaid his taxes for each year, and (2) that some part of the underpayment was due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983); sec. 6653(c). The precise amount of the underpayment resulting from fraud need not be proved. Otsuki v. Commissioner, 53 T.C. 96, 105 (1969). The statute requires only a showing that "any part" of an underpayment results from fraud. Sec. 6653(b). Fraud is never presumed; rather, it must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud, however, may be inferred by any conduct, the effect of which would be to mislead or conceal, Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943), or otherwise prevent the collection of taxes, Price v. Commissioner, 88 T.C. 860, 887 (1987); or where an entire course of conduct establishes the necessary intent. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), *178 affg. T.C. Memo 1985-148; Kotmair v. Commissioner, 86 T.C. 1253, 1260 (1986); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983); see Stone v. Commissioner, 56 T.C. 213, 224 (1971). The sophistication of the taxpayer is also relevant to the determination of fraud. Halle v. Commissioner, 175 F.2d 500, 503 (2d Cir. 1949), affg. 7 T.C. 245 (1946); Kucera v. Commissioner, T.C. Memo 1989-424. Fraud may also be proven by circumstantial evidence (including the implausibility of the taxpayer's explanations, Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court), because direct evidence of the taxpayer's intent is rarely available, Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986). See Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986). For purposes of section 6653(b), fraud means "actual, intentional wrongdoing," *179 Mitchell v. Commissioner, 118 F.2d 308 (5th Cir. 1941); or the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo 1966-81; McGee v. Commissioner, 61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The courts have developed a number of objective indicators, or "badges," which tend to establish fraud. See Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986); Recklitis v. Commissioner, supra at 910. A fraudulent underpayment of taxes may result from an overstatement of deductions as well as an understatement of income. Drobny v. Commissioner, supra at 1349-1351; Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Neaderland v. Commissioner, 52 T.C. 532, 540 (1969), affd. 424 F.2d 639 (2d Cir. 1970). The intent to conceal or mislead may be inferred from a pattern of conduct. See *180 Spies v. United States, 317 U.S. at 499. For example, fraud may be inferred where the taxpayer makes false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, supra at 20, or files false documents, see Stephenson v. Commissioner, 79 T.C. at 1007-1008. We find a number of the indicia of fraud present in this case. Petitioner submitted altered copies of his divorce decree to respondent's agents on three separate occasions, deducted payments to his former wife as alimony despite the fact the divorce decree clearly provided that no alimony was awarded, failed to include in income interest payments received from Beckman in several years, sold stock in Fun Machines but reported no gain, and gave implausible explanations to revenue agents. Deduction of the payments to Iona Ray as alimony was clearly erroneous, intentional, and fraudulent. Petitioner's concern that he was not, in fact, entitled to claim these payments as alimony is evidence by his deliberate submission to respondent of altered copies of what purported to be the final divorce decree between petitioner and Iona Ray. The documents *181 were altered to eliminate paragraph 10, which provided that Iona Ray was not awarded alimony and that she waived all of her rights to alimony. The various explanations offered by petitioner (that the altered decree reflected typographical errors or was an earlier draft of the decree) are too incredible and implausible to be believed. Despite petitioner's denials of any responsibility for altering the document or providing it to respondent, we find he knowingly and intentionally altered the decree and provided it to respondent in an attempt to justify his deduction of payments to Iona Ray as alimony. Petitioner sold stock in Fun Machines in 1981 and 1982, but reported no gain therefrom. He also failed to report significant amounts of interest income received from John Beckman in 1982, 1983, and 1984. In addition, petitioner claimed losses from Fun Machines in years in which he had a zero basis, and claimed investment tax credits without sufficient documentary evidence to establish that he was entitled to them. As a tax attorney, petitioner cannot plead ignorance to the tax consequences of these transactions. The determination of fraud in this case also involves consideration *182 of petitioners' experience and knowledge, particularly their knowledge of the tax laws. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. T.C. Memo 1982-603; e.g., O'Connor v. Commissioner, 412 F.2d 304, 310 (2d Cir. 1969). The experience and knowledge of petitioners is relevant since, in determining the presence or absence of fraud, we must consider "the native equipment and the training and experience of the party charged." Iley v. Commissioner, 19 T.C. 631, 635 (1952); see, e.g., Beaver v. Commissioner, 55 T.C. 85, 93-94 (1970). Because he was an attorney during the years at issue and had been involved in tax work since 1955, petitioner is held to a higher standard of knowledge and responsibility for his actions regarding his tax returns than someone with less training and less expertise. The knowledge and experience of a practicing tax attorney was one of the factors considered by this Court in Scallen v. Commissioner, T.C. Memo 1987-412, affd. 877 F.2d 1364 (8th Cir. 1989). In Scallen, we determined that the taxpayer, *183 a law professor who taught various courses in taxation, used his "exceptional" knowledge of the tax laws to organize and structure real estate transactions in a deliberate effort to evade tax. Accordingly, we sustain respondent's determination that petitioner was fraudulent in filing the returns in issue. Fraud is not imputed from one spouse to another. In the case of a joint return, respondent must prove fraud as to each spouse. Sec. 6653(b); Hicks Co. v. Commissioner, 56 T.C. at 1030; Stone v. Commissioner, supra at 227-228. Respondent has failed to prove by clear and convincing evidence that Joyce Ray is liable for the addition to tax for fraud. Therefore, Joyce Ray is not liable for such fraud additions. To reflect the foregoing and concessions of the parties, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50% of the interest due on $ 14,248, $ 6,881, and $ 21,515 for 1982, 1983, and 1984, respectively.↩
2. Paragraph 12 of the Judgment and Decree provides, in pertinent part, as follows: 12. That the petitioner is awarded the following real estate: * * * That respondent shall execute and deliver to petitioner her Quit Claim Deed to the foregoing properties together with any other instrument necessary to carry out this provision. * * * That the net proceeds after income taxes, encumbrances, costs of sale, etc. due thereon shall be placed in an interest bearing investment for the life of the respondent or such other period as the respondent is paid the sum of Six Hundred ($ 600.00) Dollars per month unless otherwise terminated * * *. Any and all interest from said account may be utilized for the payment to respondent of the Six Hundred ($ 600.00) Dollars per month due respondent from petitioner; said monthly amount to constitute a settlement in lieu of respondent's interest in said properties, and subject to respondent's option of accepting in lieu of such monthly payment fifty (50%) percent of the net proceeds after income taxes, encumbrances, and costs of sale. However, in the event respondent remarries, then said monthly allotment to be paid by petitioner to respondent shall cease and respondent shall receive one-half (1/2) of the net proceeds of the interest of the parties after income taxes, encumbrances and costs of sale thereon in said real estate * * * less any monthly amounts paid to respondent under this paragraph.↩
3. Paragraph 15 of the judgment and decree provided, in pertinent part: 15. During the period in which respondent and the parties' minor children occupy the homestead * * *, petitioner shall pay to respondent the support as provided in Paragraph 6 herein for a maximum amount of Thirteen Hundred Fifty and no/100 ($ 1350.00) Dollars * * *. This provision shall cease when the homestead is sold and thereafter petitioner shall pay the sums as hereinbefore provided in Paragraph 6 for support and for the respondent the monthly allotment unless in lieu thereof respondent elects to receive fifty (50%) percent of the net proceeds after income taxes as provided in Paragraph 12. It is further provided that from combined sums for support and monthly allotment to respondent, not to exceed $ 1350.00 per month, petitioner shall first pay the payment on the existing mortgage on the homestead property * * *, which includes the real estate taxes, and the balance of said $ 1350.00 shall be paid to respondent; and petitioner shall be allowed the interest on the said mortgage and the real estate taxes as deductions on his own state and federal income tax returns. Further petitioner shall be entitled to take respondent as an additional deduction unless respondent has other taxable income in excess of Six Hundred and no/100 ($ 600.00) Dollars per month.↩
4. Sec. 215(a) provides, in pertinent part: (a) GENERAL RULE. -- In the case of a husband described in section 71, there shall be allowed as a deduction amounts includible under section 71 in the gross income of his wife, payment of which is made within the husband's taxable year. * * * [The subsequent amendment of this provision by section 422(b) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 797, does not affect the instant case.]↩
5. Sec. 71(a) provides, in pertinent part, as follows: (a) GENERAL RULE. -- (1) DECREE OF DIVORCE OR SEPARATE MAINTENANCE. -- If a wife is divorced or legally separated from her husband under a decree of divorce or separate maintenance, the wife's gross income includes periodic payments (whether or not made at regular intervals) received after such decree in discharge of (or attributable to property transferred, in trust or otherwise, in discharge of) a legal obligation which, because of the marital or family relationship, is imposed on or incurred by the husband under the decree or under a written instrument incident to such divorce or separation.↩